# Exhibit 1

# Part 1

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

MOROCCANOIL INC., a California
Corporation

               Plaintiff,

    v.

MARC ANTHONY COSMETICS, INC. a
Canadian Corporation and DOES 1 through 10,
Inclusive

              Defendants.

Case No.:  2:13-cv-2747-DMG-(AGRx)

**EXPERT REPORT OF JOEL H. STECKEL, Ph.D.**
**August 19, 2014**

I.      Qualifications .................................................................................................. 2

II.     Relevant Allegations and Assignment ............................................................ 3

III.    Summary of Opinions ..................................................................................... 8

IV.     Background ..................................................................................................... 9

        A.     How the Products at Issue are Distributed ........................................... 9

        B.     A Primer on Trademark Confusion Survey Methodology.................... 14

V.      Professor Martin's Surveys Extract Improper Samples from Improper Universes........... 17

VI.     Professor Martin's Confusion Surveys Design and Implementation Deviate from Proper Marketplace Conditions ........................................................ 22

        A.     Conducting the Confusion Surveys Online is Inappropriate given the At-Issue Products .................................................................................. 22

        B.     The Context in Which Respondents were Exposed to Product Stimuli were Critically Different from the Way Consumers Encounter them in the Marketplace ...................... 23

               1.    Temporal Proximity .................................................................. 24

               2.    Brand or Product Arrays .......................................................... 26

VII.    Professor Martin Chooses Improper Controls for her Confusion Surveys ..................... 28

VIII.   Questions in Professor Martin's Survey Create Potentially Unreliable Results .............. 33

IX.     Dr. Northrup's Sampling Process is Invalid.................................................... 41

X.      Restatement of Conclusions ........................................................................... 42

## I.    Qualifications

1. I am a Professor of Marketing and the Vice Dean for Doctoral Education at the Stern School of Business, New York University, where I have taught since January 1989. I was the Chairperson of the Marketing Department for six years, from July 1998 to June 2004 and the faculty director of the Stern School Doctoral Program for five years, from May 2007 to July 2012.  I have also held either permanent or visiting faculty appointments at the Graduate School of Business, Columbia University; the Anderson Graduate School of Management, U.C.L.A.; the School of Management, Yale University; and the Wharton School, University of Pennsylvania.  I received my B.A. from Columbia University in 1977, and M.B.A., M.A., and Ph.D. degrees from the Wharton School, University of Pennsylvania in 1979, 1980, and 1982, respectively.

2. I was the Founding President of the INFORMS (Institute for Operations Research and Management Science) Society for Marketing Science, the foremost professional group for the development and application of management science theory and tools in marketing. In addition, I am a member of the American Marketing Association, the American Statistical Association, the Association for Consumer Research, the American Association for Public Opinion Research, the International Trademark Association (INTA), and the Society for Consumer Psychology.

3. My fields of specialization within marketing include marketing research methodology, marketing and branding strategies, electronic commerce, approaches for one-to-one marketing, and managerial decision making.  I am an author of three books and over 40 articles.  In the course of my scholarly research, teaching, and consulting work, I have

2

studied issues of marketing research, branding, and their roles in consumer choice and marketing strategy. My professional qualifications are described further in my curriculum vita, which is attached as Appendix A.

4. During the course of my professional career, I have designed, conducted, supervised, and/or evaluated hundreds of consumer surveys.

5. I have served as an expert witness on marketing research, marketing strategy, branding, and issues related to consumer decision making in a variety of litigation matters. In the past four years, I have testified as an expert witness in the matters listed in Appendix B.

6. Part of the work for this assignment was performed under my direction by others at Analysis Group, Inc. ("AG"), an economic and litigation consulting firm headquartered in Boston, Massachusetts. My rate of compensation for this assignment is $1,000 per hour. In addition, I receive compensation based on the professional fees of AG. No compensation is contingent upon the outcome of this research or of the case.

## II. Relevant Allegations and Assignment

7. I understand that Moroccanoil Inc. ("Moroccanoil," "Plaintiff") alleges that Marc Anthony Cosmetics, Inc. ("Marc Anthony," "Defendant") has infringed certain trademark and trade dress rights that Moroccanoil claims it has exclusive rights to. Specifically, Moroccanoil alleges that Marc Anthony infringes: (a) Moroccanoil's U.S. Trademark Registration No. 3,478,807 for the mark "MOROCCANOIL" for "Hair conditioners, namely, curl creams, hydrating styling creams, intense moisturizing masques, and styling and finishing oils;" (b) Moroccanoil's common law trademark rights in the mark

"MOROCCANOIL" for hair care products; (c) the individual trade dresses of each of Moroccanoil's products.[1]  I have been informed by Marc Anthony's Counsel that the Court has found that Moroccanoil cannot claim trade dress rights to the color turquoise blue because "trade dress refers generally to the 'total image, design, and appearance of a product'" and  "none of [Moroccanoil's] products are only turquoise, without any kind of white and orange text."[2]

8.  I understand that Moroccanoil alleges that Marc Anthony infringes Moroccanoil's federal trademark registration and Moroccanoil's claimed common law trademark rights "by using 'Oil of Morocco' for advertising, distribution and sale of the Marc Anthony Products without Moroccanoil's authorization."[3] I further understand that Plaintiff also alleges that the Defendant's "use of a virtually identical turquoise blue and other similar trade dress elements for the packaging of Marc Anthony Products infringes the Moroccanoil Trade Dress."[4]

9.  I have been informed by Marc Anthony's Counsel that to prevail on its claim relating to its registered trademark, Moroccanoil must prove that the use by Marc Anthony of the term "Oil of Morocco" on Marc Anthony's products creates a likelihood of confusion

---

[1]  Complaint, *Moroccanoil, Inc., a California Corporation v. Marc Anthony Cosmetics, Inc., a Canadian Corporation and Does 1 through 10, Inclusive, United States District Court, Central District of California, Western Division, CV13-02747*, April 16, 2013 ("Complaint"), ¶¶ 18, 28 and 35; "Moroccanoil," *United States Patent and Trademark Office*, August 5, 2008, http://tmsearch.uspto.gov/bin/showfield?f=doc&state=4806:l4llx8.2.3.

[2]  Order Denying Defendant's Motion for Judgment on the Pleadings, *Moroccanoil, Inc., a California Corporation v. Marc Anthony Cosmetics*, Inc., a Canadian Corporation and Does 1 through 10, Inclusive, United States District Court, Central District of California, Western Division, CV13-02747, May 29, 2014, p. 4.

[3]  Complaint, ¶¶ 18 and 35.

[4]  Complaint, ¶ 28.

with Moroccanoil's products covered by the trademark registration, namely hair conditioners.

10. I have further been informed by Marc Anthony's Counsel that to prove infringement of its claimed common law trademark rights in "Moroccanoil" for products other than hair conditioners, Moroccanoil must first prove that the mark "Moroccanoil" has acquired secondary meaning for each of those products, and then prove that the use by Marc Anthony of the term "Oil of Morocco" on Marc Anthony's products creates a likelihood of confusion with one or more of those Moroccanoil's products for which Moroccanoil has proved secondary meaning.  Similarly, I have been informed by Marc Anthony's Counsel that to prove infringement of its claimed trade dress rights, Moroccanoil must prove that each trade dress it alleges is being infringed has acquired secondary meaning, and then prove that the "total image, design, and appearance" of a particular Marc Anthony product creates a likelihood of confusion with the "total image, design, and appearance" of a particular Moroccanoil product whose trade dress has been shown to have acquired secondary meaning.

11. To support its registered trademark infringement, common law trademark infringement, and trade dress infringement allegations, Plaintiff Moroccanoil submitted three consumer surveys and a corpus study.[5]  Professor Ingrid Martin of the California State University at Long Beach designed and conducted the three consumer surveys discussed in this report.

---

[5] Expert Report of Ingrid M. Martin, "Report On: Purchasing Channels for Hair Care Products," July 22, 2004 ("Martin Purchasing Channels Report"); Expert Report of Ingrid M. Martin, "Report On: Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc. Brand Confusion Study," July 22, 2004 and Expert Report of Ingrid M. Martin, "Supplemental Report and Errata On: Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc. Brand Confusion Study," July 25, 2004 ("Martin Confusion Report"); Expert Report of Oliver Northrup, "Moroccanoil in American English: A Corpus Study," July 22, 2014 ("Northrup Report").

The stated objective of the first survey (the Purchasing Channels survey) was "to determine the retail channels that purchasers of Moroccanoil products use for hair care products."[6] The stated objectives of the second and third surveys (Confusion surveys) were "to determine whether or not there is a likelihood that defendant Marc Anthony Cosmetics, Inc.'s (MA) Hair Care Products would be confused with Moroccanoil, Inc.'s Hair Care Products."[7]  Professor Martin states that "[t]wo identical confusion surveys were implemented with the sole difference being the first survey (Confusion 1) used the blue colors of both [Moroccanoil] and [Marc Anthony] at the time of when the survey was run (November 2013).  The second survey (Confusion 2) was conducted to test the recent change in [Marc Anthony] turquoise blue.  The turquoise blue colors used for the [Moroccanoil] and [Marc Anthony] were the current colors on the market at the time of the second confusion survey (July 2014)."[8]  Dr. Oliver Northrup performed "a corpus study to determine whether the term *Moroccanoil* is generally used by American English speakers as a brand name or a generic term."[9]

12. According to Professor Martin's analyses of the data, her Purchasing Channels survey shows that "[p]articipants who were aware of [Moroccanoil] products searched for information and shopped for hair care products in multiple retail channels."[10]  The specific channels identified by Professor Martin are "salon(s)/spa(s)," "retail store(s)" and

---

[6]    Martin Purchasing Channels Report, p. 4.

[7]    Martin Confusion Report, p. 4.

[8]    Martin Confusion Report, p. 4.

[9]    Northrup Report, p. 2.

[10]   Martin Purchasing Channels Report, p. 17.

"website(s)."[11] On average, respondents purchased 16.5 percent of their hair care products in salons/spas, 66.4 percent in retails stores, and 17.1 percent in websites.[12]

13. According to Professor Martin's analysis of data from the Confusion surveys, "net confusion levels of 30% to 34% signal a level of confusion in one study and replicating this with similar net confusion levels in a second study (34% to 36%) with updated packaging and color used by [Moroccanoil] and [Marc Anthony], provides highly reliable results."[13]

14. According to Dr. Northrup's analyses of the data he collected from Amazon.com, the corpus study shows "that the term *Moroccanoil* is predominantly used to refer to a brand."[14]

15. I was asked by The Hecker Law Group, PLC, Counsel for the Defendant, Marc Anthony, to review the reports submitted by Professor Martin and render a scientific opinion on the validity and relevance of her surveys to any or all of Moroccanoil's infringement allegations (registered trademark, common law trademark, and trade dress). I was also asked to render an opinion as to what degree any conclusions that could be reached based on those surveys, including the conclusions reached by Professor Martin, could be relied upon with any degree of scientific certainty. I was further asked to assess the validity of the sampling process used by Dr. Northrup for his corpus study.

---

[11] Martin Purchasing Channels Report, p. 16.
[12] Martin Purchasing Channels Report, pp. 16-17.
[13] Martin Confusion Report, p. 33.
[14] Northrup Report, p. 3.

16. A complete list of the materials I considered in conducting this assignment is attached as Appendix C.

## III.    Summary of Opinions

17. Based on my professional experience and training and my work in this matter, I find that no conclusion can be drawn from these reports with regard to the allegations made by the Plaintiff because of the many flaws in the Plaintiff's experts' research and analyses as described below.

18. With respect to the Purchasing Channels and Confusions surveys conducted by Professor Martin, I find that

- Professor Martin's surveys extract improper samples from improper universes;

- Professor Martin's Confusion surveys' design and implementation do not represent proper marketplace conditions;  In particular,

    i.   Conducting the Confusion surveys online is inappropriate given the products at issue, and

    ii.  The context in which respondents are exposed to product stimuli is critically different from the way consumers encounter them in the marketplace; more specifically

        1. The temporal proximity of product exposures in the survey distorts marketplace conditions; and

        2. Presenting the stimuli as arrays of products within a brand also distorts marketplace conditions.

- Professor Martin chooses improper control stimuli for her Confusion surveys; and

- Questions in Professor Martin's surveys create potentially unreliable results because they do not adhere to best practices. Furthermore, proper pretests could have eliminated some biases inherent in the questions.

- Dr. Northrup used an invalid sampling process in his corpus study.

19. These flaws individually and collectively render the Martin and Northrup reports wholly unreliable with respect to the conclusions they purport to reach, as well as any others relevant to this case that could possibly be inferred from these data.

## IV.    Background

20. To fully assess the surveys submitted by Moroccanoil as evidence in this case, I need to establish some background in two categories. First, I describe how the two brands at issue are distributed. Second, I present a brief primer on confusion studies.

### A.    How the Products at Issue are Distributed

21. Moroccanoil distributes hair care products that contain Moroccan argan oil.[15]  Marc Anthony distributes numerous lines of hair care products, including products containing macadamia nut oil, coconut oil, and Moroccan argan oil.[16]  I understand that only the Marc Anthony products that contain Moroccan argan oil, which Marc Anthony labels with the words "Oil of Morocco Argan Oil,"[17] are at issue in this case.

---

[15]   "Products," *Moroccanoil*, http://www.moroccanoil.com/usa/h_us_en/products, visited on August 12, 2014; MO_0163049-0163079.

[16]   See "Products & Demos," *Marc Anthony*, http://www.marcanthony.com/products.php, visited on August 12, 2014.

[17]   "Products & Demos – Oil of Morocco Argan Oil," *Marc Anthony*, http://www.marcanthony.com/products/oil-of-morocco-argan, visited on August 12, 2014; and MAC 011850-011854.

22. Although Moroccanoil and Marc Anthony hair care products are available throughout the United States, they are distributed through distinctly different channels.  Moroccanoil products are sold at salons and spas (hereafter collectively referred to as "salons").[18] According to Gerardo Ludert, Director of Moroccanoil's legal department, "[Moroccanoil] is determined to keep sales exclusively in the salon where they belong…and extensively monitor the market and have a full team of buyers for traditional businesses and online dedicated exclusively to finding diverted product in the market."[19] In contrast, Marc Anthony products are primarily sold at large mass-market retailers, such as CVS/pharmacy and Walgreens.[20] It is my understanding that Marc Anthony does not distribute its products through Amazon.[21]

23. The customer experience, product pricing, and store/shelf placement differ across the channels in which Moroccanoil and Marc Anthony products are primarily sold.  First, as I

---

[18] "Salon Professionals," *Moroccanoil*, http://www.moroccanoil.com/usa/h_us_en/salon-professionals, visited on August 12, 2014.  Moroccanoil partners with spas that offer Moroccanoil body care products. See "Spa Treatment Overview," *Moroccanoil*, http://www.moroccanoil.com/usa/b_us_en/spa-treatment, visited on August 12, 2014.

[19] "United We Stand," *American Salon*, Vol. 135, Issue 7, July 2012, pp. 124-128.

[20] "Where to Buy," *Marc Anthony*, http://www.marcanthony.com/buy.php, visited on August 1, 2014. There are two salons in Canada to which Marc Anthony products are distributed. "Marc Anthony Salon Locations," *Marc Anthony*, http://www.marcanthony.com/salons/locations, visited on August 12, 2014. See also, Deposition of Marc Anthony Venere, May 2, 2014, p. 51. These large mass-market retailers primarily sell through brick-and-mortar stores. For example, although Walgreens does not break out how much of its revenue comes from online sales, *Internet Retailer.com* estimated that in 2012, Walgreens Co. generated approximately 1.3 percent of its net sales from online sales ($900 million online sales of $71.633 billion total net sales made in 2012) (See Form 10-K, Walgreens Co., filed October 19, 2012, and Rueter, Thad, "2014 Promises More Returns and In-store Pickups of Online Orders," *InternetRetailer.com*, January 21, 2014, http://www.internetretailer.com/2014/01/21/2014-promises-more-free-returns-and-store-pickups). In addition, a 2010 analysis conducted by *24-7 Wall St.* showed that in a group of "25 huge, publicly traded retailers in the U.S.," Walgreens and CVS were amongst the lowest in terms of the ratio of annual revenue to the company's share of Internet traffic.  Specifically, CVS had the lowest rank and Walgreens had the third-lowest rank of the 25 publicly traded retailers. The study also noted that "[p]harmacies…do not do particularly well…although the companies have well-established e-commerce operations and sophisticated websites, people tend to shop for drugstore items…by visiting physical locations." (See McIntyre, Douglas, A., "Major Retailers that Can't Get It Together Online," *NBCNews.com*, September 1, 2011, http://www.nbcnews.com/id/44316312/ns/business-retail/t/major-retailers-cant-get-it-together-online/.)

[21] "Where to Buy," *Marc Anthony*, http://www.marcanthony.com/buy.php, visited on August 1, 2014.

describe in more detail below, mass-market retailers often organize hair care products in large aisles on stacked shelves, with many different brands, and prominently displayed prices.  In contrast, salons often display products prominently at the entrance or near a receptionist desk, carry fewer brands than mass-market retailers, and many do not display prices.  Second, the customer experience in salons is relationship-oriented, with professional hair stylist or beautician recommendations often driving sales of hair care product sold within the salon.[22] In contrast, customers shopping for hair care products at mass-market retailers rarely, if ever, would encounter a professional hair stylist or beautician that could provide recommendations at the point of sale.  Finally, hair care products sold in salons are generally priced higher than those sold in mass-market retailers.[23]

24. To help illustrate the different experiences and contexts associated with these distinct distribution channels for Moroccanoil and Marc Anthony products, I gathered information on each company's products at a convenience sample of salons and mass-market retailers throughout the United States.  First, I identified salons and geographically adjacent mass-market retailers in nine U.S. cities (see Appendix D and Exhibit 1).[24] Second, under my direction, Analysis Group employees visited each salon and mass-market retailer, collected information on product placement, product

---

[22]  Koehn, Nancy F., and Helms, Erica, "Bumble and bumble: Building a Successful Business in Beauty and Fashion," *Harvard Business School*, February 24, 2006, p. 7.

[23]  Koehn, Nancy F., and Helms, Erica, "Bumble and bumble: Building a Successful Business in Beauty and Fashion," *Harvard Business School*, February 24, 2006, p. 6.

[24]  The nine cities are Boston, New York City, Washington D.C., Chicago, Denver, Dallas, San Francisco, Menlo Park, and Los Angeles. See Appendix D for a detailed description of how I selected these salons and mass-market retailers, and the protocols I directed Analysis Group employees to follow. Exhibit 1 provides  an overview of the findings from this convenience sample of nine salons and nine mass-market retailers throughout the United States.

availability, and product prices. They then photographed the product displays within the salon or mass-market retailer.

25. As shown in Appendix E, the number of product offerings by each party and product placement differed across the two distribution channels. Marc Anthony products are primarily sold at mass-market retailers and pharmacies where merchandise is organized by aisle and by product category. Within a hair care product aisle, Marc Anthony products are displayed among an array of other comparably branded hair-care products, which are often stacked on several shelves that can span the length of the store. The large selection of product packages range in color, size, dispenser type, and graphics, among other features. Generally, each product has a price displayed nearby.

26. Contrary to the experience at mass-market retailers, shopping at salons where Moroccanoil products are sold is markedly different. As shown in Appendix E, in each salon, there is a prominent and visible location within the store where Moroccanoil products are displayed. There are generally fewer shelves than in mass-market retailers and the retail price for products is often not displayed. Additionally, given the personal atmosphere of salons, an employee who is knowledgeable of the available products often approaches shoppers. There is a range of product types available at these salons (e.g., mousse or hair wax) and there may be a handful of brands available; none had as broad a range of brands as those found in the mass-market retailers.

27. As shown in Exhibit 2, the prices of the Moroccanoil and Marc Anthony products in my sample differed. For example, at Mizu, a salon from my sample located in Boston, MA, a 250 ml bottle of Moroccanoil Extra Volume Conditioner was priced at $25.00; whereas, at Walgreens, the Boston mass-market retailer in my sample geographically adjacent to

Mizu, a 250 ml bottle of Marc Anthony Oil of Morocco Argan Oil Conditioner was priced at $7.99, or approximately 1/3 of the price of the similarly sized Moroccanoil conditioner.

28. To complement these findings, I collected online product information from Moroccanoil's and mass-market retailers' (CVS, Rite-Aid, Harmon Stores, Ulta, Amazon.com, and Drugstore.com) websites. As shown in Exhibit 3, similar to the findings in my sample of salons and mass-market retailers, for every product category, Marc Anthony products were consistently priced lower than Moroccanoil products.

29. Professor Martin acknowledges that Marc Anthony and Moroccanoil products are sold through different channels. Professor Martin notes that she selected two distinct "control" brands "given the difference that [Moroccanoil] is found and sold exclusively in partner spas and salons nationwide and on their website as well as on some general websites such as Amazon.com (albeit without [Moroccanoil's] permission)."[25] For those two controls, Professor Martin selected one brand that is "sold in standalone stores, boutiques in department stores […] and on websites […]" to be a "close match" to Moroccanoil, and another control brand that is "sold in similar retail outlets as the [Marc Anthony] including ULTA, CVS drugstores, Target, WalMart, and on websites […]" to be a "close match" to Marc Anthony.[26] Despite acknowledging that the distribution channels are distinct, Professor Martin fails to account for the distribution channel context in the design of her Confusion surveys. In fact, while her selection of two controls suggests that she recognizes that distribution channels may influence consumer

---

[25] Martin Confusion Report, p. 19.
[26] Martin Confusion Report, pp. 18-19.

behavior and perception, as I discuss below, Professor Martin's Confusion surveys fail to

adequately contextualize the sales of these products.

### B.    A Primer on Trademark Confusion Survey Methodology

30. According to the seven-factor framework cited in the Federal Judicial Center's *Manual*

*for Complex Litigation*[27] (hereafter "MCL"), a proper survey (whether for trademark

purposes or otherwise) must at a minimum conform to the following criteria**:**

   a.   The population was properly chosen and defined;

   b.   The sample chosen was representative of that population;

   c.   The questions asked were clear and not leading;

   d.   The data gathered were accurately reported;

   e.   The data were analyzed in accordance with accepted statistical principles;

   f.   The process was conducted to ensure objectivity; and

   g.   The survey was conducted by qualified people following proper interview

        procedures.

As I shall illustrate in the following pages, Professor Martin's surveys violate at least

five of the above seven criteria.  Without investigating the raw data, I have no reason to

suspect that they were not accurately reported as gathered (MCL criterion d).

Furthermore, I assume that Professor Martin conducted her surveys with the intentions of

---

[27]    Manual for Complex Litigation, *Federal Judicial Center*, Fourth Edition, 2004, p. 103.

being objective (MCL criterion f); although, aspects of the surveys were conducted in a manner that made them anything but objective as I shall illustrate.

31. Professor Shari Diamond writes in the Federal Judicial Center's Reference Manual on Scientific Evidence, "(s)urveys that merely record consumer impressions have a limited ability to answer questions about the origins of those impressions. The difficulty is that the consumer's response to any question on the survey may be the result of information or misinformation from sources other than the trademark the respondent is being shown or the commercial he or she has just watched."[28] She continues to suggest that "(i)t is possible to adjust many survey designs so that causal inferences about the effect of a trademark or an allegedly deceptive commercial become clear and unambiguous. By adding one or more appropriate control groups, the survey expert can test directly the influence of the stimulus."[29] The purpose of a control is to account for possible alternative explanations for the results and for random noise.

32. The common appropriate survey design involves respondents being shown two stimuli (in this case images of hair care products), one called a test stimulus that contains the hypothesized causal variable (in this case, any or all ALLEGEDLY CONFUSING TRADEMARK ELEMENTS) and another to serve as a control stimulus that does not. The difference between the test and control group levels of inference with respect to a SPECIFIC IMPRESSION (in this case, AN IMPRESSION OF MOROCCANOIL AS A SOURCE OR AFFILIATION) in such surveys represents the net degree to which the

---

[28] Diamond, Shari S., "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Third Edition, The National Academies Press, 2011, pp. 359-423, at p. 397.

[29] Diamond, Shari S., "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Third Edition, The National Academies Press, 2011, pp. 359-423, at p. 398.

statements contained in the test stimulus caused that impression.  The control group

measure represents the alternative explanations for respondents' responses (such as

preexisting beliefs) and other random "noise" (such as guessing or yea-saying which may

occur despite warnings not to do so).

33. To be effective, a control must eliminate all alternative explanations for any results

suggesting respondents form a SPECIFIC IMPRESSION OF SOURCE OR

AFFILIATION from the ALLEGEDLY INFRINGING TRADEMARK ELEMENTS

(i.e., results that purport to demonstrate that a fraction of the test group perceived that

Marc Anthony products either came from or were affiliated with Moroccanoil).  To

eliminate all alternative explanations other than the causal nature of the allegedly

misleading trademark elements, the control must not contain anything related to the

allegedly infringing elements and the specific confusion impression, yet be as close as

possible to the test (i.e., allegedly infringing) product in all other respects.  Control

products that differ from the test in more than one way, open the door to alternative

explanations for results and therefore destroy inferences related to the causal variable.

34. As Professor Diamond also notes, "[i]n designing a survey-experiment, the expert should

select a stimulus for the control group that shares as many characteristics with the

experimental stimulus as possible, with the key exception of the characteristic whose

influence is being assessed."[30]

---

[30]    Diamond, Shari S., "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Third
Edition, The National Academies Press, 2011, pp. 359-423, at p. 399.

35. In the sections that follow, I describe the various ways that Professor Martin's surveys fail to conform to the criteria described above. Because of the many flaws in the design and implementation of Professor Martin's surveys that I describe below, no conclusions can be drawn from her results with regard to the registered trademark, common law trademark, and trade dress infringement allegations made by the Plaintiff.

## V. Professor Martin's Surveys Extract Improper Samples from Improper Universes

36. Consumer surveys typically collect data from a sample of a target population and generalize the results from those data to the larger population. The target that the survey is designed to generalize to is called the relevant universe or population, which, as Professor Diamond describes, "consists of all elements (i.e., individuals or other units) whose characteristics or perceptions the survey is intended to represent."[31] Indeed, as I described above, the first two factors in the seven-factor framework cited in the Federal Judicial Center's Manual for Complex Litigation for proper survey design relate to the proper choice of target population and the appropriate extraction of a sample that represents that target.[32] The selection of the proper universe is crucial because, even if appropriate questions are asked in an appropriate manner, if the questions are asked to the wrong individuals, the results of the survey will be irrelevant.[33] Professor Martin's description of the target populations in her surveys and the populations from which the qualified respondents were drawn are inappropriate given her research objectives.

---

[31]  Diamond, Shari S., "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Third Edition, The National Academies Press, 2011, pp. 359-423, at p. 376.

[32]  Manual for Complex Litigation, *Federal Judicial Center*, Fourth Edition, 2004, p. 103.

[33]  McCarthy, J. T., *McCarthy on Trademarks and Unfair Competition*, Fourth Edition, Vol. 6, Thomson Reuters, 2012, at §32:162.

37. According to her research objective for the Purchasing Channels survey, the target
population or universe is "purchasers of Moroccanoil products."[34]  She provides no
explicit target population for the Confusion surveys.

38. Screening questions are often used to qualify representative members of the target
population.[35]  Two of Professor Martin's screening questions ask respondents whether
they have purchased hair care products in the past 3 months for themselves or someone in
their household, and whether they intend to make such a purchase in the following 3
months.[36]  My reading of Appendix C and K to her Confusion report (Online Survey with
Programmer Instructions) leads me to believe that this was the primary qualifying
mechanism for her Confusion surveys and therefore reflects Professor Martin's target
population to which she intends to generalize the results of her surveys.  This group is
likely purchasers of hair care products.  Lacking an explicit target population, I will refer
to "purchasers of hair care products" as the surveys' implied target population.  However,
like the target population for the Purchasing Channels survey, it is an inappropriate target
given the products in this matter and the manner in which they are offered, marketed, and
distributed.

39. On its face, the Purchasing Channels survey purports to inquire about what channels
purchasers of Moroccanoil products use to purchase hair care products.  However,
Moroccanoil sells body products in addition to hair care products.[37]  As such, Professor

---

[34]  See ¶11 above.

[35]  Diamond, Shari S., "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Third
Edition, The National Academies Press, 2011, pp. 359-423, at pp. 386-387.

[36]  Martin Confusion Report, Appendix C, pp. 1-2.

[37]  "Moroccanoil Body Page," *Moroccanoil*, http://www.moroccanoil.com/usa/b_us_en, visited on August 12,
2014.

Martin's universe includes purchasers of Moroccanoil body products who do not
necessarily purchase Moroccanoil hair products.  As such, the target population is likely
too broad and over-inclusive.

40. As Professor Diamond discusses, an overly broad sample where irrelevant respondents
cannot be identified based on their responses "reduce[s] the value of the survey."[38]

41. More specifically, to the extent that Professor Martin and/or Moroccanoil wishes to use
the Purchasing Channels survey to conclude that Moroccanoil hair care customers shop
for Moroccanoil hair care products online, the over-inclusive universe invalidates that
conclusion.  If the cognitive processes of those body product-only individuals differ from
those of the hair care individuals in the marketplace, then including them in the data will
bias the overall results.  Indeed, there is every reason to expect that their evaluation
processes would differ as they would have different experiences with the brand.

42. Furthermore, Professor Martin's sample does not represent her target population in the
Purchasing Channels survey.  To qualify to participate in the Purchasing Channels
survey, Professor Martin asked a screening question supposedly to ensure that "[a]ll
participants in the channel survey had to have knowledge of [Moroccanoil]."[39] Based on
this screening criterion, which I note that she does not include in her Confusion surveys,
Professor Martin attempts to represent the target population as people who have ever *seen*
Moroccanoil products.  However, this screening question does not identify her target

---

[38]  Diamond, Shari S., "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Third
Edition, The National Academies Press, 2011, pp. 359-423, at p. 379.

[39]  Martin Purchasing Channels Report, p. 6. The screener question in the survey displays images of Moroccanoil
products and asks "Have you ever seen **ANY** of these products before?" See Martin Purchasing Channels
Report, Appendix C, p. 2.

population of "*purchasers* of Moroccanoil products."[40] (emphasis added) This is an

important distinction because one may have *seen* a product before but not be a *purchaser*,

or potential purchaser, of that product.  For example, one may have seen a Rolls Royce

vehicle but may never have the ability or desire to purchase one.  Therefore, given her

own stated research objective, Professor Martin's Purchasing Channels sample not only

uses an inappropriate target population, it compounds the error by taking an inappropriate

(also over-inclusive) sample from that population.

43. Moving to the Confusion surveys, Professor Martin has an implied target population of

purchasers of hair care products and claims to find them with screening questions asking

potential respondents whether they have purchased hair care products in the past 3

months for themselves or someone in their household or intend to make such a purchase

in the following 3 months.

44. First, the implied target population is again too broad.  Professor McCarthy writes, "(i)n a

traditional case claiming 'forward' confusion, not 'reverse' confusion, the proper

universe to survey is composed of the potential buyers of the *junior user*'s goods or

services, not the senior user's customers."[41]  In other words, the appropriate target

population would be customers of Marc Anthony products.

45. Given that the appropriate target population to examine questions of consumer confusion

resulting from the sale of Marc Anthony products is Marc Anthony's target customers,

Professor Martin's implied target population and her stated research objective, which is

not restricted to Marc Anthony's customers, are both inappropriate.

---

[40]  Martin Purchasing Channels Report, p. 4.

[41]  McCarthy, J. T., *McCarthy on Trademarks and Unfair Competition*, Fourth Edition, Vol. 6, Thomson Reuters,
2012, at §32:161.

46. If the cognitive processes of those individuals in Professor Martin's implied target population differ from those of Marc Anthony's customers in the marketplace, including data from non-Marc Anthony customers would bias the overall results. Indeed, there is every reason to expect that this would be the case.

47. In particular, I have seen no evidence that Marc Anthony's target customers are likely to be familiar with Moroccanoil products or that they are likely to shop in salons where Moroccanoil products are available. Therefore, the results of Professor Martin's Purchasing Channels survey notwithstanding, the Confusion surveys provide no evidence about the likely confusion of Marc Anthony customers, who primarily shop in mass-market retailer stores.

48. In fact, the array of price points included in Professor Martin's surveys indicates that more than 40 percent of respondents make purchases outside of the observed range for relevant Marc Anthony products (47.7 percent in the first Confusion survey and 41.4 percent in the second Confusion survey).[42] Given the manner in which Q_1 is asked ("How much money did you spend on your last purchase of a hair care product?"), one cannot exclude portions of the respondent group and recalculate the results for an appropriate target because respondents may have purchased more than one item.[43]

49. In sum, the inappropriate target populations and sampling procedures violate MCL criteria a and b.

---

[42]    Martin Confusion Report, p. 21. See Exhibit 2 and Exhibit 3 for prices of selected Marc Anthony products.
[43]    Martin Confusion Report, p.21.

## VI.    Professor Martin's Confusion Surveys Design and Implementation Deviate from Proper Marketplace Conditions

### A.    Conducting the Confusion Surveys Online is Inappropriate given the At-Issue Products

50. For Professor Martin's Confusion surveys to generalize to the marketplace (i.e., have external validity), she needs to demonstrate that the critical context of the actual purchase environment can be sufficiently replicated in an online survey.

51. First, the Purchasing Channels survey does not demonstrate that an online survey can represent meaningful marketplace conditions. Moroccanoil and Marc Anthony products are both sold primarily through brick-and-mortar businesses and notably they are sold through distinctly different types of businesses (salon and mass-market retailers, respectively).[44] In fact, the results of Professor Martin's Purchasing Channels survey show that brick-and-mortar businesses (salons/spas and retail stores) are the channel of choice for hair care products amongst consumers who recognize the Moroccanoil products presented in the study. Specifically, Professor Martin concluded that on average only 17 percent of hair care product purchases by a select sub-sample of hair care purchasers in the Purchasing Channels survey were purchased online during the past 12 months.[45]

52. Second, if Professor Martin wishes to project the results from her online surveys to offline conditions, she needs to implicitly assume that her surveys provide sufficient

---

[44]    See Section IV.A for a discussion of how Moroccanoil and Marc Anthony products are distributed.

[45]    Martin Purchasing Channels Report, p. 16. Note that the Verde Group study cited by Professor Martin also shows that brick-and-mortar is the channel of choice for U.S. consumers. See "Understanding the Multi-Channel Shopper," *Verde Group, Jay H. Baker Retailing Center, Wharton School of the University of Pennsylvania*, 2012, p. 2, http://www.wharton.upenn.edu/bakerretail/files/multi-channel_shopping_exec_summary_Apr_2012.pdf.

information to participants to simulate offline consumer behavior and perception; such is
not the case.

53. The flat, static, two-dimensional, front view only photographs used as stimuli, without
additional images or information available from an in-person examination of the product
packaging (e.g., lists of ingredients, manufacturers, sourcing, or packaging material), and
without sufficient control over the colors and rendering of images on the respondents'
screens (which could range from small smartphone screens to large monitors), is clearly
insufficient.  It deprives the respondent of information that s/he would normally have if
s/he were to view these products in a salon or retail store where s/he would be able to
examine the packages more closely.  Respondents may (and are likely to) make very
different judgments or inferences in a more realistic context that would contextualize
consumer perceptions.

   **B.    The Context in Which Respondents were Exposed to Product Stimuli were
          Critically Different from the Way Consumers Encounter them in the
          Marketplace**

54. Context is critical to the (external) validity of a consumer survey.  Contexts and settings
govern the extent to which results from a survey can be generalized from the research
sample to the target populations and settings outside of the survey.  Consumer judgments
are valid only insofar as they are made about stimuli that they would view in the real
world in the manner in which they would encounter them in the real world.  The context
in which a stimulus is represented provides survey respondents with information they use

23

in forming judgments when faced with a question about that stimulus.[46]  As Professor

McCarthy writes, "…a survey is designed to prove the state of mind of a prospective

purchaser."[47]  Therefore, "the closer the survey context comes to marketplace conditions,

the greater the evidentiary weight it has."[48]

55. Professor Martin's confusion surveys differ from marketplace conditions in two critical

respects: temporal proximity of brand exposures and the nature of the product or brand

array viewed.

### 1.    Temporal Proximity

56. Professor Martin's Confusion surveys begin with exposing respondents to Moroccanoil.

Immediately after that, she exposed them to three long arrays of products from three

brands, Marc Anthony and two "control brands"—Kiehl's and Giovanni.  Respondents

were then asked as to whether any of the three brands bore any relation to Moroccanoil.

This approach places the exposure of Moroccanoil and Marc Anthony products very close

to each other in time.

57. Professor Martin justifies this in her "Confusion" report:

> The behavior that we typically see in the marketplace follows this pattern: A
> consumer can go from (e.g.) Nordstrom's spa ([Moroccanoil]) to Nordstrom's
> beauty counter (Kiehl) and then walk out of the door to Nordstrom's department
> store and go several doors away to the ULTA Beauty Supply Store where they
> will find many different brands and types of hair care products including the test
> brand ([Marc Anthony]) and one of the control brands (Giovanni). This shows

---

[46]  Sudman, Seymour, Norman M. Bradburn, and Norbert Schwartz, *Thinking About Answers: The Application of Cognitive Processes to Survey Methodology*, Jossey-Bass Publishers, 1996, pp. 100-129.  The authors use the term context very broadly.  In particular, previously formed judgments, features of the judgment target or stimulus, and general norms all provide contexts from which respondents draw information.

[47]  McCarthy, J. T., *McCarthy on Trademarks and Unfair Competition*, Fourth Edition, Vol. 6, Thomson Reuters, 2012*, §32:163.

[48]  McCarthy, J. T., *McCarthy on Trademarks and Unfair Competition*, Fourth Edition, Vol. 6, Thomson Reuters, 2012*, §32:163.

how easily a consumer can be exposed to these four brands within a short period of time resulting in each brand going into proximal and then (potentially) distal memory, prior to making a choice.[49]

58. Although it is possible that some individuals in the marketplace *may* have followed the pattern of behavior described above, Professor Martin's conclusion that "[t]he behavior that we *typically* see in the marketplace follows this pattern…"[50] (emphasis added) is unrealistic.  Professor Martin provides no evidence to support this conclusion, and therefore the statement cannot be used as the basis for legitimizing the results of her surveys, especially in light of the distinct channels of distribution for the brands at issue.  In particular, Professor Martin collected no specific evidence that the participants in her surveys—or more importantly, Marc Anthony's target customers—shop for hair care products in this way.

59. More likely, Marc Anthony customers either never encounter Moroccanoil products or, if they do, a significant period of time will have passed between exposures to the two brands.

60. Professor Martin made things worse by permitting survey participants to "move back and forward within the survey."[51]  By not disabling use of the browser "Back" button in her "Confusion" surveys, Professor Martin emphasized the deviation between her surveys and marketplace conditions in which consumers typically shop for Moroccanoil and Marc Anthony products.  When comparing the test brand (Marc Anthony) images and the two control brands (Kiehl's and Giovanni) images, respondents could have clicked the "Back" button, allowing them to toggle back-and-forth between those images and the

---

[49] Martin Confusion Report, p. 32.
[50] Martin Confusion Report, p. 32.
[51] Martin Confusion Report, p. 9.

Moroccanoil images with the intention of identifying certain attributes of the

Moroccanoil products to refine their responses to Questions 3 through 6. By allowing

respondents to use the "Back" button, the results of the Confusion surveys may simply

reflect respondents seeking which of the three alternatives best maps to the Moroccanoil

products based on a flawed impression that one should map and therefore respondents

could simply go back and search. While participants in the survey can view the products

one after another *ad infinitum*, shoppers in the market place would rarely, if ever,

encounter the two brands side-by-side, let alone in the same building, because the two

brands are sold through separate channels.

61. In cases like this, where products are primarily sold in different stores, even if they are in

the same category, sequential exposure in a short period of time does not represent the

real world marketplace, even if the products belong to the same category.[52] In such

instances the monadic or Eveready design is more appropriate.[53]

## 2. Brand or Product Arrays

62. While Professor Martin appears to have attempted to arrange the Marc Anthony and

control products images in the Confusion surveys to resemble how a customer might

encounter Moroccanoil products in a salon, she has not done the same with respect to

how consumers would encounter Marc Anthony products. As described above and

shown in Appendix E (photographs from my convenience sample of mass-market

retailers), mass-market retailers do not appear to present Marc Anthony products in

---

[52] See, for example, Opinion and Order, *THOIP v. The Walt Disney Company, et al.*, United States District Court, Southern District of New York, 08 Civ. 6823 (SAS), August 13, 2010, p. 43.

[53] In an Eveready survey format, respondents are asked "to name the company that they think puts out the junior mark." Thornburg, Robert H., "Trademark Surveys: Development of Computer-Based Survey Methods," *The John Marshall Review of Intellectual Property Law*, Vol. 4, No. 91, 2004, pp. 91-124, at p. 104.

isolation or in comparable clusters of different Marc Anthony branded products.  On the
contrary, the products are placed in close proximity to similarly priced competing
products in a long array by type of product (e.g., shampoo and conditioners or hair
spray).[54]

63. Placing the Marc Anthony products surrounded by competitive brands, as it is displayed
in mass-market retailers, would present a different information set to respondents and
would likely elicit different judgments.  In particular, placing them surrounded by
competitors would likely de-emphasize the blue color of the product which is one of "the
trademark elements that are alleged to be confusingly similar" (i.e., the color turquoise
blue, and the use of the words Moroccan oil, oil of Morocco, and Moroccanoil).[55] To be
sure, placing the Marc Anthony products in a long array makes the blue more salient and
cannot help but (artificially) increase the resemblance to Moroccanoil products.

64. As another example, in the Marc Anthony product line image, Professor Martin displayed
the bottle for Marc Anthony's oil treatment product removed from and standing in front
of the box in which it is sold, which is not how it is displayed on store shelves, and which
obscures the distinctive photograph and other design elements that are normally visible
when the product is on store shelves.  Again, the image of the Marc Anthony product is
constructed to correspond to the way Moroccanoil's oil treatment product is commonly

---

[54]  Professor Martin presents Moroccanoil's "Hydrating Styling Cream" (in Confusion Survey 1) and
Moroccanoil's "Intense Hydrating Mask" (in Confusion Survey 2) second from the left. Marc Anthony's
"Conditioner" and "Conditioners" of both Giovanni and Kiehl's are found in the same location in each brand's
image.  Professor Martin does not use Moroccanoil's "Conditioner" in the Moroccanoil image group. Notably,
Moroccanoil's "Conditioner" comes in a white bottle and is a similar size and shape to Moroccanoil's
"Shampoo." ("Hydrating Conditioner," Moroccanoil, http://www.moroccanoil.com/usa/h_us_en/hydrating-
conditioner-230, visited on August 12, 2014; Martin Confusion Report, Appendix V).  Professor Martin does
not acknowledge nor provide any explanation for why the product types differ across stimuli, nor why her
second product in the two Moroccanoil images in the two separate confusion studies are not identical.

[55]  Martin Confusion Report, p. 18.  Also note that Professor Martin's surveys do not allow one to evaluate
confusion for a single product or the use of a single term, e.g., "Oil of Morocco."

displayed in salons, namely with the bottle removed from its box.[56]  This can only lead to an upward bias in the confusion estimate.

65. Professor Martin's survey design decisions indicate that she recognizes the importance of some of these factors, yet she does not sufficiently address them in her stimuli.  For example, Professor Martin conducted two separate surveys to account for the change in the package coloring.[57] Similarly, she claimed to have studied "store/spa planograms for [Moroccanoil] and [Marc Anthony] as well as the competitor brands to evaluate the individual brands,"[58] but as the research conducted at salons and mass-market retailers reveals, the layout of the stimuli presented in the surveys does not reflect the manner in which these products are presented to actual consumers.[59]

## VII.    Professor Martin Chooses Improper Controls for her Confusion Surveys

66.  As reflected in the primer on trademark confusion survey analysis and the citations to Professor Diamond above, a control stimulus should differ from a test stimulus only in the characteristics being assessed.

67. In this case, Professor Martin made some curious choices with respect to the controls used in her Confusion surveys.  She abandoned the traditional paradigm of a control group as described in ¶ 32 in favor of "control brands" being displayed to the same group. After exposing respondents to Moroccanoil, she exposed them to three long arrays of products from three brands, Marc Anthony and two "control brands"—Kiehl's and

---

[56]    See Figure 53 in Appendix E for an example of how Moroccanoil's oil treatment product is commonly displayed in salons.

[57]    Martin Confusion Report, p. 4.

[58]    Martin Confusion Report, p. 8.

[59]    See Appendix E.

Giovanni.  Respondents were then asked whether any of the three brands bore any

relation to Moroccanoil.  In general, Professor Martin then takes the difference between

responses identifying the Marc Anthony products and responses identifying the control

brands as being related to Moroccanoil as measures of (likelihood of) confusion.

68. She selected Kiehl's and Giovanni as control brands to "eliminate the trademark elements

that are alleged to be confusingly similar" (i.e., the color turquoise blue, and the use of

the words Moroccan oil, oil of Morocco, and Moroccanoil).[60] Professor Martin also

further states that "[t]he Kiehl's hair care product line was a close match to [Moroccanoil]

and the Giovanni hair care product line was a close match to [Marc Anthony]," in terms

of price points, brand positioning, and channels of distribution.[61] Both of the control

brands' products included the words 'argan oil' on their respective packages.[62] In

addition, Kiehl's products are sold in "standalone stores, boutiques in department

stores…and on websites," whereas Giovanni's products are sold in "similar retail outlets

as the test brand [Marc Anthony]."[63]

69. However, in her attempt to "eliminate the trademark elements that are alleged to be

confusingly similar," Professor Martin neglected to ensure that the elements that were not

alleged to be confusingly similar were the same.  As such, she cannot eliminate any

difference in those elements between the Marc Anthony products and the control brands

as a potential cause of the results she obtains.  More generally, this design allows for

innumerable alternative explanations to any confusion results Professor Martin purports

---

[60]   Martin Confusion Report, p. 18. Note that Professor Martin's surveys do not allow one to evaluate confusion or establish secondary meaning for a single product or the use of a single term, for example, "Oil of Morocco."

[61]   Martin Confusion Report, p. 18.

[62]   Martin Confusion Report, p. 19.

[63]   Martin Confusion Report, p. 19.

to obtain. Therefore, the "control brands" do not serve as controls are supposed to in the testing of causal hypotheses.

70. Specifically, the branding, packaging, and display of the control products in Professor Martin's confusion surveys share few similarities with the packaging of Moroccanoil or Marc Anthony products. Because the packaging, product shapes, and coloring differs in numerous ways amongst the various products presented in the Confusion surveys, one cannot determine with scientific certainty what is leading respondents to associate the Marc Anthony products with the Moroccanoil products at a greater rate than the purported control products are associated with the Moroccanoil products. Any one of the differences between the Marc Anthony and the "control" brands could lead to results that Professor Martin claims demonstrate confusion.

71. In particular, Professor Martin cannot eliminate the following as possible explanations of confusion of the results she obtains:

- Any brands that have the letter M in the brand are considered related;

- Any brands with similar shaped bottles or boxes are considered related;

- Any brands with a color blue of different shades are considered related.

72. Professor Martin's choice of methodology represents a violation of MCL criteria e and g. In abandoning the traditional test/control format, Professor Martin neither used proper interview procedures nor analyzed data in accordance with accepted statistical principles. Indeed, since Professor Martin's design inadequately controls for alternative non-infringement related explanations for the confusion it purports to obtain, it certainly cannot control for any specific alleged source of confusion. I discuss this in more detail below.

73. As noted earlier, Moroccanoil has made separate allegations that Marc Anthony's use of the words "Oil of Morocco" on its products creates a likelihood of confusion with Moroccanoil's U.S. Trademark Registration and its common-law trademark rights to "MOROCCANOIL" and that the trade dresses of Marc Anthony's products create a likelihood of confusion with the trade dresses of Moroccanoil's products. The "characteristic whose influence is being tested" with respect to Moroccanoil's trademark infringement allegations would therefore be the use of the words "Oil of Morocco" by Marc Anthony and "MOROCCANOIL" by Moroccanoil. Professor Martin did not, however, choose or create controls that allow any conclusions to be drawn as to the separate effects of either the use of "Oil of Morocco" or any other aspect including the color or the overall selling image (trade dress) of the Marc Anthony products.

74. To be specific, Professor Martin concludes that the color turquoise blue and the words "Oil of Morocco" and "Moroccanoil"[64] are the primary elements likely to cause confusion between Moroccanoil and Marc Anthony products. However, the packaging of the two control brands (Kiehl's and Giovanni) differ considerably in so many characteristics from Moroccanoil that she cannot conclude that the color or the words separately or together causes the brand association rates she finds in her survey. In contrast with the Moroccanoil and Marc Anthony products, the Kiehl's and Giovanni product images presented as controls have unique text, fonts, text size, graphics, shapes, and dispenser types, among other features. Any one of these could be a potential cause of the purported confusion rates. In addition, although color is a feature that Professor

---

[64]    Martin Confusion Report, pp. 4, 28-29.

Martin wishes to control for, the colors of Kiehl's and Giovanni products are so different from "turquoise blue" that using these controls bias Professor Martin's results by emphasizing the blue color as I discussed earlier in my treatment of brand vs. product displays in the stimuli. Similarly, by not providing control images of other hair care products that use the word "Morocco" or "Moroccan," Professor Martin biases the survey to exaggerate the effect of Marc Anthony's use of the words "Oil of Morocco" on its products.

75. A more appropriate survey would have included controls that would have separately eliminated each packaging or branding characteristic at issue in the case between the test and control to allow testing for the effect of each such packaging or branding characteristic. All other aspects of the products should be identical between groups. Because Professor Martin identifies two potential causative elements, a test for confusion encompassing both would require at least *three* controls to assess whether and to what extent each of the elements is causing confusion separately or together.[65] Specifically, the appropriate controls would be identical to the allegedly infringing product (e.g., Marc Anthony Oil of Morocco Argan Oil) except for the allegedly infringing features. The three controls would be: (1) Marc Anthony product with a container in a color other than turquoise blue; (2) Marc Anthony product without the words "Morocco" and "Oil" on the packaging; and (3) Marc Anthony product with a container in a color other than turquoise blue and without the words "Morocco" and "Oil" on the packaging.

---

[65] Diamond, Shari S., "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Third Edition, The National Academies Press, 2011, pp. 359-423, at p. 400.

76. Additional controls would be needed to test for elements at issue in the litigation not addressed by Professor Martin, including the trade dresses of each specific Moroccanoil product for which Moroccanoil claims trade dress rights and the trade dresses of each specific Marc Anthony product that Moroccanoil asserts infringes any such trade dress right.

## VIII.   Questions in Professor Martin's Survey Create Potentially Unreliable Results

77. Professor Martin includes several questions in her three surveys that are inherently leading or misleading and affect whether conclusions can be drawn from the results of her surveys.  As such, they constitute per se violations of MCL criterion c.

78. First, in screening question 9-1 of her Purchasing Channels survey, Professor Martin asks respondents who have viewed an image of Moroccanoil products: "Have you ever seen **<u>ANY</u>** of these products before?" Respondents are then given the opportunity to answer "Yes," "No," or "Don't know." The format of the question does not follow best practices because it does not give "[c]omparable [e]xplicit [e]mphasis to the [a]ffirmative, [n]egative, and [n]eutral positions."[66] Because the question, "Have you ever seen […]" "presents only the affirmative side of the issue, it is a leading question,"[67] and as such, it "suggests the answer to the person being interrogated."[68] The questions is also likely to

---

[66]  Jacoby, Jacob, "Are Closed-Ended Questions Leading Questions?" *Trademark and Deceptive Advertising Surveys: Law, Science and Design*, eds. Shari S. Diamond and Jerre B. Swann, American Bar Association, at p. 275.

[67]  Jacoby, Jacob, "Are Closed-Ended Questions Leading Questions?" *Trademark and Deceptive Advertising Surveys: Law, Science and Design*, eds. Shari S. Diamond and Jerre B. Swann, American Bar Association, 2012, at p. 275.

[68]  Jacoby, Jacob, "Are Closed-Ended Questions Leading Questions?" *Trademark and Deceptive Advertising Surveys: Law, Science and Design*, eds. Shari S. Diamond and Jerre B. Swann, American Bar Association, 2012, at p. 274.

be leading because it can be answered by a mere "yes" or "no," and hence "all other

things being equal, respondents—generally, agreeable people who have agreed to

participate in the first place—are more inclined to be agreeable and answer 'yes' than to

answer 'no.'"[69] The presence of individuals who have a "tendency to endorse any

assertion made in a question, regardless of its content," called "yea-sayers," is likely to

significantly inflate the observed rate of agreement.[70]

79. The likely effect of this question is that respondents are likely to be admitted to the

Purchasing Channels survey that Professor Martin did not intend to admit.  These

respondents would not be familiar with Moroccanoil products at all.  I commented earlier

(¶ 41) on the danger of including respondents who bought only Moroccanoil body

products.  The concern is amplified here as the possibility exists that some respondents

may be totally unfamiliar with Moroccanoil.  The leading nature of this question can only

make the sample more over-inclusive than it otherwise would have been.

80. Similarly, the critical question related to confusion in Professor Martin's Confusion

surveys (Question 3), which asks "Do you think any of the hair care product lines shown

above [come from or are endorsed by the same company that made the first product line

you saw]" (for which three answer choices are given in the order: "Yes," "No," "Don't

Know") is a leading question that also suffers from the same bias.  As I mentioned above,

an appropriate way to phrase Question 3 would give equal weight to a negative response

by asking: "Do you or do you not […]."  By failing to present the question in an even

---

[69] Jacoby, Jacob, "Are Closed-Ended Questions Leading Questions?" *Trademark and Deceptive Advertising Surveys: Law, Science and Design*, eds. Shari S. Diamond and Jerre B. Swann, American Bar Association, 2012, at p. 274.

[70] Diamond, Shari S., "Control Foundations: Rationales and Approaches," *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, eds. Shari S. Diamond and Jerre B. Swann, American Bar Association, 2012, at p. 204.

manner, Professor Martin is inadvertently encouraging consumers to guess or conclude that one of the products should "come from or [be] endorsed by the same company that made the first product line that" they saw.[71]  Given the dissimilarities between the control stimuli (Giovanni and Kiehl's products) and Moroccanoil, the response to a question phrased in such a biased manner is disproportionately likely to be Marc Anthony thereby artificially inflating Professor Martin's confusion estimates.

81. Further, the images of the three product lines presented on the screen where the question is asked (see Exhibit 4) are so small that the only feature that is fully apparent is the primary color of each product line (blue for Marc Anthony, maroon for Giovanni, and white for Kiehl's), thereby over emphasizing the effect of color and making the question even more leading.[72]

82. The points in the previous paragraphs echo the argument made in Section VI.B above regarding the study being done online depriving the respondents of information they would have when making these judgments in the marketplace.  In particular, Marc Anthony products are often displayed in conjunction with Organix products.  Organix products are also packaged in similar blue containers and bear the phrase "argan oil of morocco."  If the Organix products were placed alongside the Marc Anthony products, the salience of the color and the phrase designating origin would be reduced.

83. Given Professor Martin's questions are not presented in a fair and balanced manner, it is likely that respondents felt compelled to respond affirmatively.  A review of respondents'

---

[71]  Martin Confusion Report, Appendix C, pp. 4-5.

[72]  Also, Professor Martin does not provide information on whether survey users zoomed in on the images, and if so, what amount of zoom was provided to respondents.  Also, information is not provided on the types of devices (e.g., tablet, smartphone, laptop, or desktop) and screen sizes used by survey participants.

verbatim answers related to confusion indicates that at least some were guessing and brings into question any responses related to associations of the Moroccanoil and Marc Anthony brands in the Confusion surveys.  In Professor Martin's Confusion surveys, respondents who stated that they thought that the Marc Anthony products "come from or are endorsed by" Moroccanoil were asked to explain what led them to think so.  As shown in Exhibit 5a and 5b, although respondents were instructed at the beginning of the survey not to guess "if [they] have no idea at all,"[73] the respondents' verbatim responses indicate that many were guessing.  For example, in Professor Martin's first Confusion survey, Respondents 44 and 218 stated: "none," Respondent 257 stated: "nothing," Respondent 164 stated: "don't know," Respondent 41 stated: "idk," Respondents 79 and 251 stated: "n/a," Respondent 186 stated: "no reason," and Respondent 248 stated: "zxsdcfghjk,l."

84. Further, a number of participants chose two or all three products, often giving the same or similar reasons for all their choices.[74]  For example, in Professor Martin's first Confusion survey, Respondent 41 chose both Giovanni and Marc Anthony products, giving "idk" as the reason for both.[75]  Respondent 79 chose all three, giving "n/a" as the reason for each.[76]  Respondent 83 chose all three, giving "I love these products" as the reason for all three.[77]  Respondent 72 chose all three, giving "same design" as the reason for all three.[78]  Respondent 27 chose all three, giving the reasons "it looks like someone with money

---

[73]  Martin Confusion Report, Appendix C,  p. 3; Appendix K,  p. 2.

[74]  32134_Confusion1_VerbatimWith_Codes.xlsx; 32337_Confusion2_VerbatimWith_Codes.xlsx.

[75]  32134_Confusion1_VerbatimWith_Codes.xlsx.

[76]  32134_Confusion1_VerbatimWith_Codes.xlsx.

[77]  32134_Confusion1_VerbatimWith_Codes.xlsx.

[78]  32134_Confusion1_VerbatimWith_Codes.xlsx.

would use and get their hair done professionally," "it looks like it would cost a lot of money," and "it looks like it came from a high end salon somewhere in Europe."[79]  All of the examples indicate that the respondents may have felt obligated to select at least one product as being endorsed by the first company and either could not explain the association of the products or provided made up reasons because they had been guessing.

85. Tying things together, in a display that included Organix products respondents who are prone to guess would no longer have such an obvious place to go.  Indeed, the confusion rates for Marc Anthony could only go down.  This situation demonstrates how insidious and interactive lack of marketplace context, Internet display, and inappropriate wording can be.

86. The results of Professor Martin's Purchasing Channels survey are also likely biased by the fact that she did not provide explicit instructions that participants not guess.  While Professor Martin did provide this instruction not to guess in her Confusion surveys, she failed to do so in her Purchasing Channels survey.  Instructing respondents not to guess is important because "when it comes to surveys being proffered as evidence in litigated matters, answers that are guesses are not considered probative.  Thus, at some point prior to being asked closed-ended questions, the respondents need to be explicitly instructed not to guess.  Otherwise, they will be inclined to guess, and this usually will be in the directions they suspect are desired by the interviewer or researcher."[80]

---

[79]   32134_Confusion1_VerbatimWith_Codes.xlsx.

[80]   See Jacoby, Jacob, "Are Closed-Ended Questions Leading Questions?" *Trademark and Deceptive Advertising Surveys: Law, Science and Design*, eds. Shari S. Diamond and Jerre B. Swann, American Bar Association, 2012, at p. 273.

87. Another example of a potentially leading question can be found in the screener to Professor Martin's Confusion Surveys. Although she includes screening questions in each of her surveys to exclude particular respondents, her approach will not do so accurately. According to Professor Diamond, "screening questions must be drafted so that they do not appeal to or deter specific groups within the target population, or convey information that will influence the respondent's answer on the main survey."[81] In her Confusion surveys, Professor Martin included screening questions intended "to identify and eliminate atypical members of the universe [of interest]—whether they had purchased or planned to purchase hair care products, *as well as whether they worked for anyone in the hair care product industry, advertising, and marketing research industries as well as to whether they had completed a hair care study in the last three months* (emphasis added)."[82] However, in these screening questions Professor Martin asked about work experience and recent purchases in ways that may suggest the type of participant who is being sought.

88. For example, in screening questions 3, 4 and 5 of her Confusion surveys, Professor Martin asked respondents: "Do you or someone in your household work [for/as…]" followed by a particular profession or a type of company. By asking the question in this way, Professor Martin failed to blind "the inclusion criteria so that screening questions do not in themselves reveal the 'right answer.'"[83] A more appropriate screening question would be "Do you or anyone in your household work for the following:" followed by a

---

[81] Diamond, Shari S., "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Third Edition, The National Academies Press, 2011, pp. 359-423, at pp. 386-387.

[82] Martin Confusion Report, p. 18.

[83] Gelb, Gabriel M., and Betsy D. Gelb, "Internet Surveys for Trademark Litigation: Ready or Not, Here They Come," *The Trademark Reporter*, Vol. 97, No. 5, 2007, pp. 1073-1088, at pp. 1081-1082.

list of several types of firms, some of which are those that would exclude a respondent if they were to respond positively and others that would not.  Such an approach would not signal a focus on hair care products, and would reduce the likelihood of participants guessing the "right answer."[84]

89. Professor Martin's surveys also fail to follow best practices with respect to ensuring accurate recall.  In her Purchasing Channels survey she asks for a particularly long recall window (12 months) that is four times longer than the screener in her confusion surveys (3 months).  Question 5 in the Purchasing Channels survey asks: "Think about the hair care products you purchased over the past 12 months." Recall of regular actions such as hair care purchases are unlikely to be accurate over such a long period.  Professor Martin uses only 3-month recall windows in other questions, which would be more appropriate (pretesting would have helped to determine the appropriate recall window for hair-care product purchases).[85] It is unclear why Professor Martin uses different recall windows throughout her surveys, but research suggests that using shorter recall windows in survey questions results in more reliable responses.[86]

90. Finally, I am not aware of any evidence that Professor Martin conducted survey pretests or other qualitative research to evaluate whether the survey questions in her three surveys

---

[84]  Gelb, Gabriel M., and Betsy D. Gelb, "Internet Surveys for Trademark Litigation: Ready or Not, Here They Come," *The Trademark Reporter*, Vol. 97, No. 5, 2007, pp. 1073-1088, at pp. 1081-1082.

[85]  In Professor Martin's Channels survey, questions 1, 2, and 3 use a recall window of 12 months, whereas screener questions 7 and 8 use a recall window of 3 months. In Professor Martin's Confusion surveys, screener questions 6, 7, and 10, and distractor question 2 use a recall window of 3 months. See Martin Purchasing Channels Report, Appendix C and Martin Confusion Report, Appendix C and K.

[86]  Schwarz, Norbert, and Daphna Oyserman, "Asking Questions about Behavior: Cognition, Communication, and Questionnaire Construction," *American Journal of Evaluation*, Vol. 22, No. 2, 2001, pp. 127–160, at pp. 136-138.

are reliable and whether the survey controls in her Confusion surveys are relevant.[87]
Since I have no evidence of any pretest or exploratory studies, I must assume that none
were done.  This is unfortunate since pretests could have diagnosed many of the
aforementioned ills and led to appropriate cures.

91. Professor Diamond writes, "[t]exts on survey research generally recommend pretests as a
way to increase the likelihood that questions are clear and unambiguous, and some courts
have recognized the value of pretests," and that "pilot work is a standard and valuable
way to improve the quality of a survey and […] it often results in word changes that
increase clarity and correct misunderstandings."[88] The American Association for Public
Opinion Research, an organization of approximately 1,900 survey research professionals,
of which I am one, from academia, non-profit organizations, polling firms, and
government, shares Professor Diamond's view that pre-tests are critical: "[a] pretest of
the questionnaire […] is the only way of finding out if everything 'works' […] [b]ecause
it is rarely possible to foresee all the potential misunderstandings or biasing effects of
different questions or procedures, it is vital for a well-designed survey operation to
include provision for a pretest.  All questions should be pretested to ensure that questions
are understood by respondents."[89]

92. As mentioned above, pretests could have cured many of the ills in Professor Martin's
surveys.  A simple questioning of pretest respondents could easily have revealed that the

---

[87] It is my understanding that Counsel for Marc Anthony confirmed that no pre-test information is available.

[88] Diamond, Shari S., "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Third Edition, The National Academies Press, 2011, pp. 359-423, at pp. 388-389.

[89] "Best Practices," *American Association for Public Opinion Research (AAPOR)*, http://www.aapor.org/Best_Practices.htm, visited on July 29, 2014.

controls were inappropriate and that the questions were leading, certainly the critical

question in the Confusion surveys.

## IX.    Dr. Northrup's Sampling Process is Invalid

93.  Dr. Northrup concludes that "[b]ased on a corpus of American English collected from

online product reviews for haircare products … the term *Moroccanoil* is predominantly

used to refer to a brand."[90]  One cannot use this observation to conclude more generally

that the term *Moroccanoil* is used to refer to a brand in other contexts when referring to

hair care products.

94.  To conduct his analysis, Dr. Northrup first builds a corpus using online customer product

reviews from the "Beauty>Hair Care" category on Amazon.com.  He then examines a

sample of these customer product reviews containing variations in capitalization and

spelling of the term Moroccanoil to identify instances in which the term is used to

describe the Moroccanoil brand.  Dr. Northrup's sampling process is flawed if one wants

to generally conclude that the term is used as a brand rather than just to conclude

something about the use of the term in online product reviews.  Dr. Northrup's corpus of

Amazon.com reviews is not representative of the full context in which the words might

appear (e.g., beauty magazines, trade press, and other e-commerce websites).  In addition,

Dr. Northrup relies on a skewed sample of product reviews prepared by customers and

not including industry participants, professionals, or advertisers, which given the

availability of particular products on Amazon is likely to be centered on reviews of the

Moroccanoil products specifically.  As his corpus appears to ignore a large number of

---

[90]    Northrup Report, p. 3.

sources in which variations of the term Moroccanoil would be referenced, Dr. Northrup's study is incomplete at best, and no conclusions should be drawn with regard to the allegations in this case from the results of Dr. Northrup's analysis.

## X. Restatement of Conclusions

95. To reiterate, my work has led me to conclude to a reasonable degree of scientific certainty, that both Professor Martin's surveys and Dr. Northrup's corpus study are fatally flawed.  As such, the conclusions that Professor Martin and Dr. Northrup reach, as well as any others derived from the data collected in those studies that bear on this matter cannot be relied upon with any degree of scientific certainty.

96. The particular flaws these studies suffer from include:

- Professor Martin's surveys extract improper samples from improper universes;

- Professor Martin's Confusion surveys' design and implementation do not represent proper marketplace conditions;  In particular,

   i. Conducting the Confusion surveys online is inappropriate given the products at issue, and

   ii. The context in which respondents are exposed to product stimuli is critically different from the way consumers encounter them in the marketplace; more specifically

      1. The temporal proximity of product exposures in the survey distorts marketplace conditions; and

> 2. Presenting the stimuli as arrays of products within a brand also distorts marketplace conditions.

- Professor Martin chooses improper control stimuli for her Confusion surveys; and

- Questions in Professor Martin's surveys create potentially unreliable results because they do not adhere to best practices. Furthermore, proper pretests could have eliminated some biases inherent in the questions.

- Dr. Northrup used an invalid sampling process in his corpus study.

97. I reserve the right to amend or supplement these conclusions should further information become available to me as discovery proceeds.


_____

Joel H. Steckel
August 19, 2014

**Exhibit 1**
**Convenience Sample Overview**
**Nine Salons and Nine Mass-market Retailers in Nine U.S. Cities**

| City | Number of unique brands of hair care products | | | | | | Approached by a salesperson? | | | | Availability of products | | | |
| | Salon | | | Retailer | | | Salon | | Retailer | | Moroccanoil | | Marc Anthony | |
| | < 10 | 10 - 25 | > 25 | < 10 | 10 - 25 | > 25 | Yes | No | Yes | No | Salon | Retailer | Salon | Retailer |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Boston | X | | | | | X | X | | | X | X | | | X |
| Chicago | | X | | | | X | X | | | X | X | | | X |
| Dallas | X | | | | | X | | X | | X | X | | | X |
| Denver | X | | | | | X | X | | | X | X | | | X |
| Los Angeles | X | | | | | X | X | | | X | X | | | X |
| Menlo Park | X | | | | | X | X | | X | | X | | | X |
| New York City | X | | | | X | | X | | | X | X | | | X |
| San Francisco | X | | | | X | | X | | | X | X | | | X |
| Washington D.C. | X | | | | | X | X | | | X | X | | | X |

**Notes:**

[1] The names and locations of the salons and mass-market retailers included in the sample are listed in Appendix D.

[2] Photographs of Moroccanoil and Marc Anthony products displays in each salon and mass-market retailer are presented in Appendix H. Moroccanoil products generally were located near the entrance of the salon and/or near a reception desk. Marc Anthony products were all located in a hair care product aisle.

**Exhibit 2**
**Price Comparison of Selected Moroccanoil and Marc Anthony Products From Convenience Sample of Mass-market Retailers and Salons**
**Prices As of August 5, 2014**

| Product | Size (ml) | Average Price | Boston | Chicago | Dallas | Denver | Los Angeles | Menlo Park | New York City | San Francisco | Washington D.C. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ***Marc Anthony Oil of Morocco Argan Oil*** | | | | | | | | | | | |
| Sulfate Free Shampoo | 250 | $ 8.09 | $ 7.99 | - | $ 7.99 | $ 7.99 | $ 8.29 | $ 7.99 | $ 8.49 | $ 7.99 | $ 7.99 |
| Sulfate Free Conditioner | 250 | $ 8.09 | $ 7.99 | - | $ 7.99 | $ 7.99 | $ 8.29 | $ 7.99 | $ 8.49 | $ 7.99 | $ 7.99 |
| Treatment | 50 | $ 8.15 | - | $ 8.49 | $ 7.99 | $ 7.99 | $ 8.29 | $ 7.99 | $ 8.49 | $ 7.99 | $ 7.99 |
| Sulfate Free Volumizing Mousse | 250 | $ 8.39 | - | - | - | - | $ 8.29 | - | $ 8.49 | - | - |
| Sulfate Free Volumizing Hairspray | 300 | $ 9.37 | $ 8.99 | $ 9.49 | $ 8.99 | $ 8.99 | $ 9.89 | $ 9.49 | $ 9.99 | $ 9.49 | $ 8.99 |
| ***Moroccanoil*** | | | | | | | | | | | |
| Clarifying Shampoo | 250 | $ 24.17 | $ 25.20 | $ 24.00 | $ 28.00 | $ 22.00 | - | $ 22.00 | - | $ 24.00 | $ 24.00 |
| Intense Hydrating Mask | 75 | $ 16.00 | $ 16.00 | - | - | - | - | - | - | - | - |
| Treatment | 100 | $ 44.40 | $ 47.00 | $ 45.00 | - | $ 44.00 | - | - | - | $ 46.00 | $ 40.00 |
| Volumizing Mousse | 250 | $ 29.83 | $ 28.00 | $ 36.00 | $ 31.00 | - | - | $ 28.00 | $ 28.00 | - | $ 28.00 |
| Luminous Hairspray Medium Finish | 330 | $ 23.83 | $ 22.20 | $ 24.00 | $ 24.50 | $ 23.00 | $ 26.25 | $ 22.00 | $ 25.53 | $ 25.00 | $ 22.00 |
| Extra Volume Conditioner | 250 | $ 25.28 | $ 25.00 | $ 26.00 | $ 28.00 | $ 22.00 | - | $ 25.00 | $ 25.21 | $ 26.00 | $ 25.00 |

**Notes:**

[1]  A dash indicates that a product was unavailable at specified location.

[2]  All products except Moroccanoil Extra Volume Conditioner are included in the images presented in Professor Martin's Confusion surveys.

**Source:**

[A]  See Appendix D.

**Exhibit 3**
**Price Comparison of Selected Moroccanoil and Marc Anthony Products From Online Retailers**
**Prices As of August 14, 2014**

| Category | Company | Product | Size (ml) | Price | Price Source |
|---|---|---|---|---|---|
| Conditioner | Marc Anthony | Oil of Morocco Argan Oil Sulfate Free Conditioner | 250 | $ 6.99 | Drugstore.com |
| | | | | $ 6.99 | Harmon Discount |
| | | | | $ 7.99 | Rite Aid |
| | | | | $ 7.99 | Ulta |
| | Moroccanoil | Extra Volume Conditioner | 250 | $ 25.00 | Moroccanoil.com |
| Shampoo | Marc Anthony | Oil of Morocco Argan Oil Sulfate Free Shampoo | 250 | $ 6.99 | Harmon Discount |
| | | | | $ 6.99 | Drugstore.com |
| | | | | $ 7.99 | Rite Aid |
| | | | | $ 7.79 | Walgreens |
| | | | | $ 7.99 | Ulta |
| | Moroccanoil | Clarifying Shampoo | 250 | $ 25.20 | Moroccanoil.com |
| Treatment | Marc Anthony | Oil of Morocco Argan Oil Treatment | 50 | $ 7.99 | CVS/pharmacy |
| | | | | $ 6.99 | Drugstore.com |
| | | | | $ 6.99 | Harmon Discount |
| | | | | $ 7.99 | Rite Aid |
| | | | | $ 7.79 | Walgreens |
| | Moroccanoil | Treatment | 100 | $ 43.00 | Moroccanoil.com |
| Mousse | Marc Anthony | Oil of Morocco Argan Oil Volumizing Mousse | 250 | $ 6.99 | Harmon Discount |
| | | | | $ 6.99 | Drugstore.com |
| | | | | $ 7.99 | Walgreens |
| | | | | $ 7.99 | Ulta |
| | Moroccanoil | Volumizing Mousse | 250 | $ 28.00 | Moroccanoil.com |
| Hair Spray | Marc Anthony | Oil of Morocco Argan Oil Volume Shine Hairspray | 300 | $ 8.99 | CVS/pharmacy |
| | | | | $ 7.99 | Drugstore.com |
| | | | | $ 7.99 | Harmon Discount |
| | | | | $ 8.49 | Walgreens |
| | | | | $ 8.99 | Ulta |
| | Moroccanoil | Luminous Hair Spray Medium Finish | 330 | $ 22.20 | Moroccanoil.com |
| Mask | Moroccanoil | Intense Hydrating Mask | 75 | not available separately | Moroccanoil.com |

**Notes:**

[1]    All products except Moroccanoil Extra Volume Conditioner are included in the images presented in Professor Martin's Confusion surveys.

[2]    Product price sources included online retailers that distribute Marc Anthony products in the United States according to Marc Anthony's website (see http://www.marcanthony.com/buy.php), and Moroccanoil's website.

**Sources:**

[A]  "Extra Volume Conditioner," Moroccanoil, http://www.moroccanoil.com/usa/h_us_en/extra-volume-conditioner-231, visited on August 14, 2014.

[B]  "Clarifying Shampoo," Moroccanoil, http://www.moroccanoil.com/usa/h_us_en/clarifying-shampoo, visited on August 14, 2014.

[C]  "Moroccanoil Treatment," Moroccanoil, http://www.moroccanoil.com/usa/h_us_en/moroccanoil-treatment, visited on August 14, 2014.

[D]  "Volumizing Mousse," Moroccanoil, http://www.moroccanoil.com/usa/h_us_en/volumizing-mousse, visited on August 14 2014.

[E]  "Luminous Hairspray Medium," Moroccanoil, http://www.moroccanoil.com/usa/h_us_en/luminous-hairspray-1011, visited on August 14, 2014.

[F]  "Moroccanoil Intense Hydrating Mask," Moroccanoil, http://www.moroccanoil.com/usa/h_us_en/intense-hydrating-mask-640, visited on August 14, 2014.

[G]  "Marc Anthony True Professional Oil of Morocco Argan Oil Conditioner," drugstore.com, http://www.drugstore.com/marc-anthony-true-professional-oil-of-morocco-argan-oil-conditioner/qxp396771?catid=183400, visited on August 14, 2014.

[H]  "Marc Anthony True Professional Oil of Morocco Argan Oil Shampoo," drugstore.com, http://www.drugstore.com/marc-anthony-true-professional-oil-of-morocco-argan-oil-shampoo/qxp396770?catid=183479, visited on August 14, 2014.

[I]  "Marc Anthony True Professional Oil of Morocco Argan Oil Treatment," drugstore.com, http://www.drugstore.com/marc-anthony-true-professional-oil-of-morocco-argan-oil-treatment/qxp396772?catid=183520, visited on August 14, 2014.

[J]  "Marc Anthony True Professional Oil of Morocco Argan Oil Volumizing Mousse," drugstore.com, http://www.drugstore.com/marc-anthony-true-professional-oil-of-morocco-argan-oil-volumizing-mousse/qxp452219?catid=183517, visited on August 14, 2014.

[K]  "Marc Anthony True Professional Oil of Morocco Argan Oil Hair Spray," drugstore.com, http://www.drugstore.com/marc-anthony-true-professional-oil-of-morocco-argan-oil-hair-spray/qxp469886?catid=183515, visited on August 14, 2014.

[L]  "Marc Anthony Oil of Morocco Conditioner," Harmon, http://www.harmondiscount.com/621732300024.html, visited on August 14, 2014.

[M]  "Marc Anthony Oil of Morocco Shampoo," Harmon, http://www.harmondiscount.com/621732300017.html, visited on August 14, 2014.

[N]  "Marc Anthony Oil of Morocco Treatment," Harmon, http://www.harmondiscount.com/621732300031.html, visited on August 14, 2014.

[O]  "Marc Anthony Oil of Morocco Volumizing Mousse," Harmon, http://www.harmondiscount.com/621732300048.html, visited on August 14, 2014.

[P]  "Marc Anthony Oil of Morocco Argan Oil Hairspray," Harmon, http://www.harmondiscount.com/621732300079.html, visited on August 14, 2014.

[Q]  "Marc Anthony Oil of Morocco Conditioner," Rite Aid, http://shop.riteaid.com/Marc-Anthony-Oil-Morocco-Conditioner/dp/B007EP9GF4?class=quickView&field_availability=-2&field_browse=3003305011&field_keywords=marc+anthony&id=Marc+Anthony+Oil+Morocco+Conditioner&ie=UTF8&refinementHistory=brandtextbin%2Csubjectbin%2Ccolor_map%2Cprice%2Csize_name&searchKeywords=marc+anthony&searchNodeID=3003305011&searchPage=2&searchRank=salesrank&searchSize=12#.U-EKDPlSYgE, visited on August 14, 2014.

[R]  "Marc Anthony Oil of Morocco Shampoo," Rite Aid, http://shop.riteaid.com/Marc-Anthony-Oil-Morocco-Shampoo/dp/B007JUQFOE?class=quickView&field_availability=-2&field_browse=3003305011&field_keywords=marc+anthony&id=Marc+Anthony+Oil+Morocco+Shampoo&ie=UTF8&refinementHistory=brandtextbin%2Csubjectbin%2Ccolor_map%2Cprice%2Csize_name&searchKeywords=marc+anthony&searchNodeID=3003305011&searchPage=1&searchRank=salesrank&searchSize=12#.U-EJb_ISYgE, visited on August 14, 2014.

[S]  "Marc Anthony Argan Oil Treatment, Oil of Morocco, For All Hair Types," Rite Aid, http://shop.riteaid.com/Marc-Anthony-Argan-Treatment-Morocco/dp/B007EP9APA?class=quickView&field_availability=-2&field_browse=3003305011&field_keywords=marc+anthony&id=Marc+Anthony+Argan+Treatment+Morocco&ie=UTF8&refinementHistory=brandtextbin%2Csubjectbin%2Ccolor_map%2Cprice%2Csize_name&searchKeywords=marc+anthony&searchNodeID=3003305011&searchPage=1&searchRank=salesrank&searchSize=12#.U-EJxPlSYgE, visited on August 14, 2014.

[T]  "Marc Anthony Oil of Morocco Argan Oil Conditioner," Ulta, http://www.ulta.com/ulta/browse/productDetail.jsp?productId=xlsImpprod4180927, visited on August 14, 2014.

[U]  "Marc Anthony Oil of Morocco Argan Oil Shampoo," Ulta, http://www.ulta.com/ulta/browse/productDetail.jsp;jsessionid=nBb4yS6V2Ze2QKaD77fXFQ5B.pr-a1-app1?productId=xlsImpprod4180921, visited on August 14, 2014.

[V]  "Marc Anthony Oil of Morocco Argan Oil Volumizing Mousse," Ulta, http://www.ulta.com/ulta/browse/productDetail.jsp?productId=xlsImpprod5250295, visited on August 14, 2014.

[W]  "Marc Anthony Oil of Morocco Argan Oil Volume Shine Hairspray," Ulta, http://www.ulta.com/ulta/browse/productDetail.jsp;jsessionid=nBb4yS6V2Ze2QKaD77fXFQ5B.pr-a1-app1?productId=xlsImpprod5250301, visited on August 14, 2014.

[X]   "Marc Anthony True Professional Oil of Morocco Argan Oil Shampoo," Walgreens, http://www.walgreens.com/store/c/marc-anthony-true-professional-oil-of-morocco-argan-oil-shampoo/ID=prod6124611-product, visited on August 14, 2014.

[Y]   "Marc Anthony True Professional Oil of Morocco Argan Oil Treatment," Walgreens, http://www.walgreens.com/store/c/marc-anthony-true-professional-oil-of-morocco-argan-oil-treatment/ID=prod6144193-product, visited on August 14, 2014.

[Z]   "Marc Anthony True Professional Oil of Morocco Argan Oil Volumizing Mousse, Walgreens, http://www.walgreens.com/store/c/marc-anthony-true-professional-oil-of-morocco-argan-oil-volumizing-mousse/ID=prod6171540-product, visited on August 14, 2014.

[AA]  "Marc Anthony True Professional Oil of Morocco Argan Oil Hair Spray," Walgreens, http://www.walgreens.com/store/c/marc-anthony-true-professional-oil-of-morocco-argan-oil-hair-spray/ID=prod6124613-product, visited on August 14, 2014.

[AB]  "Marc Anthony Oil of Morocco Argan Oil Treatment," CVS Pharmacy, http://www.cvs.com/shop/product-detail/Marc-Anthony-Oil-of-Morocco-Argan-Oil-Treatment?skuId=954253, visited on August 14, 2014.

[AC]  "Marc Anthony Oil of Morocco Argan Oil Sulfate Free Volume + Shine Hairspray," CVS Pharmacy, http://www.cvs.com/shop/product-detail/Marc-Anthony-Oil-of-Morocco-Argan-Oil-Sulfate-Free-Volume--Shine-Hairspray?skuId=954252, visited on August 14, 2014.



**Exhibit 5a**
**Professor Martin's Confusion Survey #1 Question 5**
**Verbatim Responses from Respondents Who Likely Felt Compelled to Answer Or Guess**

| Respondent ID | Brand that respondent believed was made or endorsed by Moroccanoil | Verbatim response [1] |
|---|---|---|
| 0000000041 | Marc Anthony | idk |
| 0000000044 | Marc Anthony | none |
| 0000000079 | Marc Anthony | n/a |
| 0000000164 | Marc Anthony | don't know |
| 0000000186 | Marc Anthony | no reason |
| 0000000218 | Marc Anthony | none |
| 0000000248 | Marc Anthony | zxsdcfghjk,l |
| 0000000251 | Marc Anthony | n/a |
| 0000000257 | Marc Anthony | nothing |
| 0000000041 | Giovanni | idk |
| 0000000043 | Giovanni | NONE |
| 0000000079 | Giovanni | n/a |
| 0000000181 | Giovanni | wasn't sure if this was the first 1 |
| 0000000197 | Giovanni | just a hunch |
| 0000000199 | Giovanni | na |
| 0000000248 | Giovanni | swertyuikl;lkjnhbgvfc |
| 0000000263 | Giovanni | cffsghsnf |
| 0000000079 | Kiehl's | n/a |
| 0000000168 | Kiehl's | its not that good |
| 0000000177 | Kiehl's | better |
| 0000000219 | Kiehl's | ? |
| 0000000318 | Kiehl's | ok |
| 0000000418 | Kiehl's | not sure |

**Note:**

[1]  Verbatim response to Question 5: "In particular, what is it that makes you think that this product line comes from or is endorsed by the same company that made the first product line that you saw? Please type your answer in the box below, being as specific and detailed as you can." See Martin Confusion Report, Appendix C, p. 5.

**Source:**

[A]  32134_Confusion1_VerbatimWith_Codes.xlsx, received from counsel July 29, 2014.

**Exhibit 5b**
**Professor Martin's Confusion Survey #2 Question 5**
**Verbatim Responses from Respondents Who Likely Felt Compelled to Answer Or Guess**

| Respondent ID | Brand that respondent believed was made or endorsed by Moroccanoil | Verbatim response [1] |
|---|---|---|
| 2000000044 | Marc Anthony | just a guess |
| 2000000133 | Marc Anthony | guess |
| 2000000143 | Marc Anthony | Idk |
| 2000000181 | Marc Anthony | nothing |
| 2000000219 | Marc Anthony | I don't know |
| 2000000220 | Marc Anthony | ?? |
| 2000000227 | Marc Anthony | no |
| 2000000252 | Marc Anthony | Na |
| 2000000266 | Marc Anthony | na |
| 2000000292 | Marc Anthony | uyjyujuy |
| 2000000325 | Marc Anthony | yes |
| 2000000370 | Marc Anthony | Just a guess |
| 2000000378 | Marc Anthony | I was mistaken |
| 2000000131 | Giovanni | good |
| 2000000220 | Giovanni | ?? |
| 2000000246 | Giovanni | not sure |
| 2000000270 | Giovanni | not sure just guessing |
| 2000000292 | Giovanni | hgjjhgfhgfj |
| 2000000299 | Giovanni | dont really know. i guess the argon oil. |
| 2000000370 | Giovanni | Just a guess |
| 2000000378 | Giovanni | I was wring |
| 2000000099 | Kiehls | Because |
| 2000000143 | Kiehls | Idk |
| 2000000261 | Kiehls | none |
| 2000000292 | Kiehls | yhjhjfgh |

**Note:**

[1]  Verbatim response to Question 5, "In particular, what is it that makes you think that the this product
line comes from or is endorsed by the same company that made the first product line that you saw?
Please type your answer in the box below, being as specific and detailed as you can." See Martin
Confusion Report, Appendix K, p. 4.

**Source:**

[A]  32134_Confusion2_VerbatimWith_Codes.xlsx, received from counsel July 29, 2014.

## Appendix A

## Curriculum Vita

### JOEL HOWARD STECKEL

New York University
812 Tisch Hall
New York, NY  10012-1126
Tel: (212) 998-0521
EMail: JSTECKEL@STERN.NYU.EDU

#### EDUCATION

UNIVERSITY OF PENNSYLVANIA, THE WHARTON SCHOOL

Doctor of Philosophy Degree (Marketing/Statistics) awarded, May 1982.
Dissertation Title:  "A Game Theoretic and Experimental Approach to the Group Choice
Phenomenon in Organizational Buying Behavior;" Professor Yoram Wind, advisor.

Master of Arts Degree (Statistics) awarded May 1980.

Master of Business Administration Degree (Management Science) awarded with
Distinction, May 1979.

Elected to Beta Gamma Sigma, May 1979.

COLUMBIA UNIVERSITY

Bachelor of Arts (Mathematics) awarded Summa Cum Laude, May 1977.

Elected to Phi Beta Kappa, May 1977.

#### ACADEMIC POSITIONS

Vice Dean for Doctoral Education, Stern School of Business, New York University,
August 2012-Present.

Director PhD Programs, Stern School of Business, New York University, May 2007-July
2012.

Marketing Department Chairperson, Stern School of Business, New York University,
July 1998-June 2004.

A-1

Professor and Associate Professor, Stern School of Business, New York University, January 1989 - present. Taught courses in Business Strategy, Marketing Management, Marketing Research, Corporate Reputation and Branding, Models of Pricing and Promotion, Field Studies in the New Economy, Marketing Engineering, and Analytic Marketing for Management Consulting. Also taught Doctoral Seminars in Mathematical Models in Marketing and Research Methods.

Visiting Professor, Wharton School, University of Pennsylvania, January 1995 - December 1995. Taught Core Marketing course.

Visiting Professor, Escola de Pós-Graduação em Ciências Económicas e Empresariais, Universidade Católica Portuguesa, May - June 1992, May - June 1993. Taught Industrial Marketing and Marketing Strategy.

Associate Professor and Assistant Professor, Graduate School of Business, Columbia University, July 1981 - December 1988. Taught MBA-level courses in Industrial Marketing, Marketing Planning, and Marketing Research. Taught three Ph.D.-level Marketing Seminars and Applied Multivariate Statistics.

Visiting Associate Professor, School of Organization and Management, Yale University, September - December 1988. Taught graduate course in Marketing Strategy.

Visiting Assistant and Associate Professor, Graduate School of Management, University of California at Los Angeles, July 1984 - June 1985, January - March 1987. Taught Advanced Marketing Management, Marketing Research, and Strategic Marketing Planning.

Assistant Instructor, Department of Statistics, University of Pennsylvania, July 1979 - June 1980. Assisted in undergraduate and MBA-level courses in Statistics. Taught undergraduate course in Calculus.

Teaching Assistant, Department of Mathematics, Columbia University, September 1976 - May 1977. Assisted in courses in Number Theory and Differential Equations.

## PROFESSIONAL INTERESTS

Marketing Strategy and Marketing Research. In particular, marketing research methodology, marketing and branding strategies, electronic commerce, approaches for one-to-one marketing, and managerial decision making.

## PUBLICATIONS

### Books

Marketing Research (with D. Lehmann and S. Gupta), Boston: Addison-Wesley Longman, 1998.

Analysis for Strategic Marketing (with V. Rao), Boston: Addison-Wesley Longman, 1998.

The New Science of Marketing: State of the Art Tools for Anticipating and Tracking the Market Forces that will Shape Your Company's Future (with V. Rao), Chicago: Irwin Professional Publishers, 1995.

## Journal Articles

"Behavioral Reasons for New Product Failure: Does Overconfidence Induce Over-forecasts?" (with D. Markovitch, A/ Michaut-Denizeau, D. Philip, and W. M. Tracy), Journal of Product Innovation Management (Forthcoming).

"Modeling Credit Card Share of Wallet: Solving the Incomplete Information Problem," (with Y. Chen), Journal of Marketing Research, Vol. 49, No. 5, October 2012.

"The Role of Consumer Surveys in Trademark Infringement: Evidence From the Federal Courts," (with R. Bird), University of Pennsylvania Journal of Business Law, Vol. 14, Issue 4, Summer 2012, 1013-1054.

"Do Initial Stock Price Reactions Provide a Good Measurement Stick for Marketing Strategies? The Case of Major New Product Introductions in the US" (with D. Markovich), European Journal of Marketing, Vol. 46, Iss. 3, 2012, 406-421.

"When Do Purchase Intentions Predict Sales?" (with V. Morwitz and A. Gupta), International Journal of Forecasting, Vol. 23, November 2007, 347-64.

"Dilution through the Looking Glass: A Marketing View of the Trademark Dilution Revision Act of 2005," (with R. Klein and S. Schussheim), The Trademark Reporter, Vol. 96, No. 3, May-June 2006.

"Choice in Interactive Environments," (with R. Winer, R.Bucklin, B. Dellaert, X. Drèze, G. Häubl, S. Jap. J.D.C. Little, T. Meyvis, A. Montgomery, and A. Rangaswamy), Marketing Letters, Vol. 16, No.3/4, 2005.

"Using Capital Markets as Market Intelligence: Evidence from the Pharmaceutical Industry," (with D. Markovich and B. Yeung), Management Science, October 2005.

"Marketing Science – Growth and Evolution," (with J. Hauser, G. Allenby, F.H. Murphy, J.S. Raju, and R. Staelin), Marketing Science, Vol. 24, No. 1, Winter 2005.

"Supply Chain Decision Making: Do Shorter Cycle Times and Shared Point of Sale Information Always Help?," (with S. Gupta and A. Banerji), Management Science, Vol. 50, No. 4, April 2004.

"Choice and the Internet: From Clickstream to Research Stream," (with R. Bucklin, J. Lattin, A. Ansari, S. Gupta, D. Bell, E. Coupey, J.D.C. Little, C. Mela, and A. Montgomery), Marketing Letters, Vol. 13, No. 3, Summer 2002.

"A Multiple Idea Point Model: Capturing Multiple Preference Effects from within an Ideal Point Framework," (with J. Lee and K. Sudhir), Journal of Marketing Research, Vol. 39, No. 1, February 2002.

"2001: A Marketing Odyssey," (with E. Brody), Vol. 20, No. 4, Marketing Science, Fall 2001.

"Consumer Strategies for Purchasing Assortments within a Single Product Class," (with Jack K.H. Lee), Journal of Retailing, Vol. 75, No. 3, Fall 1999.

"The Max-Min-Min Principle of Product Differentiation," (with A. Ansari and N. Economides), Journal of Regional Science, May 1998.

"Models of Dynamic Consumer Choice," (with R. Meyer, F. Feinberg, I. Gilboa, W. Hutchinson, A. Krishna, C. Mela, A. Pazgal, and D. Prelic), Marketing Letters, Vol. 7, No. 3, July 1997.

"Addendum to 'Cross Validating Regression Models in Marketing Research'," (with W. Vanhonacker), Marketing Science, Vol. 15, No. 1, 1996.

"Selecting, Evaluating, and Updating Prospects in Direct Mail Marketing," (with V. Rao), Journal of Direct Marketing, Vol. 9, No. 2, Spring 1995.

"A Cross-Cultural Analysis of Price Responses to Environmental Changes," (with V. Rao), Marketing Letters, Vol. 6, No. 1, January 1995.

"Cross Validating Regression Models in Marketing Research," (with W. Vanhonacker), Marketing Science, Vol. 12, No. 4, Fall 1993.

"Aggregation and Repeat Buying in Households," (with S. Gupta), Marketing Letters, Vol. 4, No. 4, October 1993.

"Roles in the NBA: There's Still Always Room for a Big Man... But it Has Changed" (with A. Ghosh), Interfaces, Vol. 23, No. 4, July-August 1993.

"Introduction to `Contributions of Panel and Point of Sale Data to Retailing Theory and Practice'," Journal of Retailing, Vol. 68, No.3, Fall 1992.

"The Relationship Between Operating Performance, Causal Attributions and Strategic Planning Activities" (with M.T. Curren and V.S. Folkes), Journal of Marketing, Vol. 56, No. 2, April 1992.

"Locally Rational Decision Making: The Distracting Relationship Between Information and Managerial Performance" (with R. Glazer and R. Winer), Management Science, Vol. 38, No. 2, February 1992.

"Prospects and Problems in Modelling Group Decisions" (with K.P. Corfman, D.J. Curry, S. Gupta, and J. Shanteau), Marketing Letters, Vol. 2, No. 3, July 1991.

"Microscale:  A Stochastic Multidimensional Scaling Methodology for the Empirical Determination of Convex Indifference Curves in Consumer Preference/Choice Analysis" (with W.S. DeSarbo and K. Jedidi), Psychometrika, Vol. 56, No. 2, June 1991.

"A Polarization Model for Describing Group Preferences" (with V. Rao),  Journal of Consumer Research, Vol. 18, No. 1, June 1991.

"Creating Conjoint Analysis Experimental Designs with Acceptable Stimuli" (with W.S. DeSarbo and V. Mahajan), Decision Sciences, Vol. 22, No. 2, Spring 1991.

"Longitudinal Patterns of Group Decisions:  An Exploratory Analysis" (with K.P. Corfman and D.R. Lehmann), Multivariate Behavioral Research, Vol. 25, No. 3, July 1990.

"Investing in the Stock Market: Statistical Aggregation of Individual Judgment"  (with N. Capon), Annals of Operations Research, Vol. 23, 1990.

"Judgmental Forecasts of Key Marketing Variables: Rational vs. Adaptive Expectations" (with R. Glazer and R. Winer), International Journal of Forecasting, Vol. 6, No. 3, July 1990.

"Committee Decision Making in Organizations: An Experimental Test of the Core," Decision Sciences, Vol. 21, No. 1, Winter 1990.

"Towards a New Method for Measuring Power:  Applying Conjoint Analysis to Group Purchase Decisions" (with J. O'Shaughnessy), Marketing Letters, Vol. 1, No. 1, December 1989.

"The Formation and Use of Key Marketing Variable Expectations:  Some Experimental Evidence" (with R. Glazer and R. Winer), Marketing Science, Vol. 8, No. 1, Winter 1989.

"A Heterogeneous Conditional Logit Model of Choice" (with W. Vanhonacker), Journal of Business and Economic Statistics, Vol. 6, No. 3, July 1988.

"Estimating Probabilistic Choice Models with Sparse Data: A Method with an Application to Groups" (with D.R. Lehmann and K. Corfman), Psychological Bulletin, Vol. 95, No. 1, January 1988.

"A Friction Model for Describing and Forecasting Price Movements" (with W.S. DeSarbo, V.R. Rao, Y.J. Wind and R. Colombo), Marketing Science, Vol. 6, No. 4, Fall 1987.

"Group Process and Decision Performance in a Simulated Marketing Environment" (with R. Glazer and R. Winer), Journal of Business Research, Vol. 15, No. 6, December 1987.

"Effective Advertising in Industrial Supplier Directories" (with D.R. Lehmann), Industrial Marketing Management, Vol. 15, No. 2, April 1985.

**Book Chapters**

"Dynamic Decision Making in Marketing Channels", with S. Gupta, and A. Banerji), in Experimental Business Research, A. Rapoport and R. Zwick (eds.), Boston, MA: Kluwer Academic Publishers, 2002.

**Refereed Proceedings**

"PIONEER:  Decision Support for Industrial Product Planning" in Efficiency and Effectiveness in Marketing, Proceedings of the American Marketing Association Educator's Conference, Vol. 54, 1988, G.L. Frazier and C.A. Ingene, eds., Chicago.

"Mathematical Approaches to the Study of Power: A Critical Review" in Advances in Consumer Research, Vol. XII, 1985, E. Hirschman and M. Holbrook, eds., Provo, UT.

"On Obtaining Measures from Ranks" in An Assessment of Marketing Thought and Practice, Proceedings of the American Marketing Association Educator's Conference, Vol. 48, B.J. Walker, ed., 1982, Chicago.

**Other**

"Forecasting Online Shopping," Stern Business, Fall/Winter 2000, pp. 22-27.

"Method to Their Madness," The Industry Standard, August 7, 2000.

Book review of The Application of Regression Analysis by D.R. Wittink, Journal of Marketing Research, Vol. 26, No. 4, November 1989.

Co-author (with many others) of The Statistics Problem Solver, Research and Education Association, New York, 1978.

**OTHER WORKING PAPERS**

"A Typology of New Product Failure: A Behavioral Model and Research Hypotheses," (with D. Markovich and A. Michaud)

"Global Market Share Dynamics: Winners and Losers in a Tumultuous World," (with P. Golder and S. Chang)

"Modeling New Product Preannouncements as a Signaling Game," (with H. Jung)

"On-Line Shopping: How Many Will Come and When Will they Get There?"

"Cost Benefit Rules in Consideration Set Formation," (with B. Buchanan and S. Sen).

"Using Attraction Models to Allocate Resources in a Competitive Environment."

"A Stochastic Model For Committee Evaluations of New Product Introductions."

A-6

"Consumer Cycle Marketing: A Behavioral Review with Strategic Implications," (with L.W. Norjean).

"On Blocking Coalitions and Models for the Combination of Individual Preference Orders."

## CONFERENCE PRESENTATIONS

"Using Surveys in Intellectual Property Cases:; What's the Damage," AIPLA Spring Meeting,  May 2013, Seattle WA.

"The Role of Consumer Surveys in Trademark Infringement Cases: Evidence from the Federal Courts," (with R. Bird), AMA Summer Educator's Conference, August 2010, Boston.

"Global Market Share Dynamics: Winners and Losers in a Tumultuous World," (with P. Golder and S. Chang),  INFORMS Marketing Science Conference, June 2010, Cologne, Germany.

"Use and Abuse of Consumer Perception Research in Antitrust and Advertising Cases," ABA Antitrust Section Spring Meeting, March 2009, Washington, DC.

"New Product Development: The Stock Market as Crystal Ball," (with D. Markovich), INFORMS Marketing Science Conference, Atlanta, GA., June 2005.

"Modeling Credit Card Usage Behavior: Where is my VISA and Should I Use It?," (with Y. Chen), INFORMS Marketing Science Conference, College Park, Md., June 2003.

"Using Capital Markets as Market Intelligence: Evidence from the Pharmaceutical Industry," (with D. Markovich and B. Yeung), INFORMS Marketing Science Conference, College Park, Md., June 2003.

"Using Capital Markets as Market Intelligence: Evidence from the Pharmaceutical Industry," (with D. Markovich and B. Yeung), Share Price Accuracy and Transition Economies Conference, U. of Mich. Law School, Ann Arbor, Mi., May 2003.

"Modeling Internet Site Visit Behavior," (with E. Bradlow and O. Sak), Joint Statistical Meetings, Indianapolis, August 2000.

"Consumer Strategies for Purchasing Assortments within a Single Product Class," (with Jack K.H. Lee), INFORMS Fall Conference, Philadelphia, November 1999.

"When Do Purchase Intentions Predict Sales?" (with V. Morwitz and A. Gupta), AMA Advanced Research Techniques Forum, Santa Fe, NM, June 1999.

"Modeling New Product Preannouncements as a Signaling Game," (with H. Jung), University of Mainz Conference on Competition in Marketing, Germany, June 1999.

A-7

"A Multiple Idea Point Model: Capturing Multiple Preference Effects from within an Ideal Point Framework," (with J. Lee), Joint Statistical Meetings, Dallas, TX, Aug. 1998.

"Modeling New Product Preannouncements as a Signaling Game," (with H. Jung), INFORMS Marketing Science Conference, Fontainbleau, France, July 1998.

"Dynamic Decision-Making in Marketing Channels: Traditional Systems, Quick Response, and POS Information," (with S. Gupta and A. Banerji), NYU Conference on Managerial Cognition, May 1998.

"When Do Purchase Intentions Predict Sales?" (with V. Morwitz and A. Gupta), INFORMS International Meetings, Barcelona, July 1997.

"Mental Models in Competitive Decision Making: A Blessing and A Curse," Conference on Competitive Decision Making, Charleston, SC, June 1997.

"When Do Purchase Intentions Predict Sales?" (with V. Morwitz and A. Gupta), INFORMS Marketing Science Conference, Berkeley, March 1997.

"Model Adequacy versus Model Comparison: Is the 'Best' Model Any 'Good'?, " (with A. Ansari and P. Manchanda), INFORMS Marketing Science Conference, Berkeley, March 1997.

"Dynamic Decision-Making in Marketing Channels: Traditional Systems, Quick Response, and POS Information," (with S. Gupta and A. Banerji), First Conference in Retailing and Service Sciences, Banff, 1994.

"Dynamic Decision-Making in Marketing Channels: Traditional Systems, Quick Response, and POS Information," (with S. Gupta and A. Banerji), Behavioral Decision Research in Management Conference, Boston, 1994.

"Modeling Consideration Set Formation:  The Role of Uncertainty," (with B. Buchanan and S. Sen), TIMS Marketing Science Conference, Tuscon, 1994.

"A Cross-Cultural Analysis of Price Conjectures to Environmental Changes," (with V. Rao), TIMS Marketing Science Conference, St. Louis, 1993.

"Decision-Making in a Dynamic Distribution Channel Environment," (with S. Gupta and A. Banerji), TIMS Marketing Science Conference, St. Louis, 1993.

"Cross Validating Regression Models in Marketing Research," (with W. Vanhonacker), TIMS Marketing Science Conference, London, 1992.

"The Influence of Stock Price on Marketing Strategy," (with D. Gautschi and D. Sabavala), TIMS Marketing Science Conference, Wilmington, DE, 1991.

"A Polarization Model for Describing Group Preferences" (with V. Rao), ORSA/TIMS National Fall Meetings, Philadelphia, 1990.

"A Polarization Model for Describing Group Preference," (with V. Rao), Behavioral Decision Research in Management Conference, Philadelphia, 1990.

"Conflict Resolution and Repeat Buying" (with S. Gupta), TIMS Marketing Science Conference, Champaign, Ill., 1990.

"Variety Seeking at the Group Level" (with S. Gupta), Association for Consumer Research Fall Meetings, New Orleans, 1989.

"On Using Attraction Models to Allocate Resources in a Competitive Environment," TIMS Marketing Science Conference, Durham, NC, 1989.

"Multidimensional Scaling with Convex Preferences" (with W.S. DeSarbo), ORSA/TIMS National Fall Meetings, St. Louis, 1987.

"A Social Comparison Model for Describing Group Preference Evaluations" (with V. Rao), TIMS Marketing Science Conference, Jouy-en-Josas, France, 1987.

"The Day the Earth Stood Still," Association for Consumer Research Fall Meetings, Toronto, 1986.

"A Friction Model For Describing and Forecasting Price Movements" (with W. DeSarbo, V. Rao, Y. Wind, and R. Colombo), ORSA/TIMS National Fall Meetings, Miami Beach, 1986.

"An Eigenvalue Method for Measuring Consumer Preferences" (with E. Greenleaf and R. Stinerock), TIMS Marketing Science Conference, Dallas, 1986.

"Creating Conjoint Analysis Experimental Designs without Infeasible Stimuli" (with W. DeSarbo and V. Mahajan), TIMS Marketing Science Conference, Dallas, 1986.

"The Mediating Role of Information in Marketing Managers' Decisions" (with R. Glazer and R. Winer), TIMS Marketing Science Conference, Dallas, 1986.

"Incorporating Interdependencies of Utility Functions into Models of Bargaining" (with S. Gupta), ORSA/TIMS National Fall Meetings, Atlanta, 1985.

"The Formation of Key Marketing Variable Expectations" (with R. Glazer and R. Winer), ORSA/TIMS National Fall Meetings, Atlanta, 1985.

"Does the Nash Equilibrium Really Describe Competitive Behavior?: The Case of Cigarette Advertising," TIMS Marketing Science Conference, Nashville, 1985.

"A Heterogeneous Conditional Logit Model of Choice" (with W. Vanhonacker), ORSA/TIMS National Fall Meetings, Dallas, 1984.

"Using a 'Robust' Response Function to Allocate Resources in a Competitive Environment," TIMS Marketing Science Conference, Chicago, 1984.

"Longitudinal Models of Group Choice Behavior," (with D. Lehmann and K. Corfman), ORSA/TIMS National Fall Meetings, Orlando, 1983.

"Considerations of Optimal Design of New Task Industrial Products," ORSA/TIMS National Fall Meetings, San Diego, 1982.

"Game Theoretic Choice Models in Organizational Buying Behavior," TIMS Special Interest Conference in Marketing Measurement and Analysis, Philadelphia, 1982.

## OTHER RESEARCH IN PROGRESS

Marketing Research in the Courtroom vs. the Boardroom: What are the Differences and Do They Matter? (with R. Bird)

The Impact of Trademark Litigation Outcomes on Brand Equity and Marketing Decision Making (with R. Bird)

Loss Aversion – Are Professional Tennis Players too Careful with the Second Serve? (with L. Nelson and S. Yang)

Modeling the Tradeoffs between Marketing Research and Flexible Manufacturing.

Modeling the Strategic Use of List Rentals (with D. Schmittlein)

## INVITED SEMINARS

| | |
|---|---|
| Columbia University | Spring 1991, Summer 1994 |
| Cornell University | Fall 1983, Spring 1989 |
| Georgetown University | Fall 2006 |
| Pennsylvania State University | Fall 1996, Fall 2006 |
| Rutgers University | Spring 1994 |
| Temple University | Fall 1995 |
| University of California, Berkeley | Spring 1990 |
| University of California, Los Angeles | Spring 1985, Spring 1996 |
| University of California, San Diego | Fall 2003 |
| University of Florida | Spring 1992 |
| University of Mainz, Germany | Summer 1998 |
| University of Michigan | Spring 1993 |
| University of Pennsylvania | Spring 1992, Spring 1995, Spring 1998 |
| University of Southern California | Spring 1987 |
| Washington University, St. Louis | Spring 2003 |

## EDITORIAL SERVICE

### Editorships

Co-Editor, *Marketing Letters,* July 2010 - Present

Guest editor, special section of <u>Marketing Science</u> on the history of marketing science theory and practice, 2001.

Consulting editor in marketing, Addison-Wesley Longman Academic Publishers, Boston, MA, 1993-1999.

Guest editor, special issue of <u>Journal of Retailing</u> on the use of panel and point of sale data, 1992.

### **Other**

Member of Editorial Boards, <u>Marketing Science</u>,  <u>Review of Marketing Science</u>, <u>Journal of Retailing</u>.

Have served as ad-hoc referee for <u>Journal of Marketing</u>, <u>Journal of Marketing Research</u>, <u>Management Science</u>, <u>Journal of Consumer Research</u>, <u>Journal of Retailing and Consumer Services</u>, <u>Manufacturing and Service Operations Management</u>, <u>Decision Sciences</u>, <u>Journal of Business and Economic Statistics</u>, <u>Journal of Econometrics</u>, <u>Strategic Information Systems</u>, <u>Corporate Reputation Review</u>, and <u>Journal of Business Research</u>.

## **SERVICE**

### **Dissertation Committees Chaired**

| | |
|---|---|
| Joseph Pancras (co-chair) | (Marketing - New York University) |
| Sergio Meza (co-chair) | (Marketing – New York University) |
| Dmitri Markovich | (Marketing – New York University) |
| Heonsoo Jung | (Marketing - New York University) |
| Jack Lee | (Marketing - New York University) |
| Asim Ansari (co-chair) | (Marketing - New York University) |
| Shahana Sen (co-chair) | (Marketing - New York University) |

### **Dissertation Committees Served on**

Tingting Fan (Marketing – New York University)
Kei-Wei Huang (Information Systems – New York University)
Sherrif Nassir (Marketing – New York University)
Jane Gu (Marketing – New York University)
Orkun Sak (Marketing – University of Pennsylvania)
Atanu Sinha (Marketing - New York University)
Louis Choi (Marketing - Columbia University)
Sunder Narayanan (Marketing - Columbia University)
Carol Rhodes (Ed. Psych. - Columbia University)
Rita Wheat (Marketing - Columbia University)
Robert Stinerock (Marketing - Columbia University)
Bruce Buchanan (Business Economics - Columbia University)

Chen Young Chang (Marketing - University of Pennsylvania)

## Other Discipline Related Service

Chairperson, Marketing Committee, INFORMS, January 2006 – June 2010.

Past President, INFORMS Society on Marketing Science, January 2004 – December 2005.

Founding President, INFORMS Society on Marketing Science, January 2003 – December 2003.

President, INFORMS College on Marketing, January 2002 – December 2002.

President Elect, INFORMS College on Marketing, January 2000- December 2001.

Secretary-Treasurer, INFORMS College on Marketing, January 1998-December 1999.

Association of Consumer Research, Annual Program Committee, 1999.

Co-Organizer of 1996 Conference on Consumer Choice and Decision Making, Arden House, Harriman, New York, June 1996.

Organized Marketing Sessions at Fall 1989 TIMS/ORSA Joint National Meetings, New York, October 1989.


## Other University Related Service

Member, Research Resources Committee, Stern School of Business, September 2009 – Present.

Chair, Statistical and Quantiative Reasoning Task Force, Stern School of Business, September 2005 – August 2007.

Member, Specialization Committee, Stern School of Business, September 2004 - Present.

Member, PhD Oversight Committee, Stern School of Business, January 2006 – May 2007.

Member, Executive Committee, Digital Economy Initiative, Stern School of Business, January 2000 – August 2002.

Member, Board of Directors, Center for Information Intensive Organizations, Stern School of Business, September 1998 – December 1999.

Member of MBA Committee, Stern School of Business, New York University, 1989-December 1998.  Committee was responsible for supervising redesign of MBA programs in 1991 and 1995, Chairman September 1997-August 1998.

A-12

Member of Stern MBA Curriculum Review Committee, September 1997-December 1998.  Committee redesigned MBA Core.

Member of Stern School Committee on Improving Consulting Activities, July 1998-December, 1998.

Member of Building Committee, Stern School of Business, New York University, 1990-1992.

Member of Research Committee, Stern School of Business, New York University, 1990-1.

Elected member of Columbia University Senate.  Served on Budget Review and Alumni Relations Committees, 1986-1988.


**AWARDS**

Awarded the J. Parker Bursk Memorial Prize as the outstanding student participating in the Department of Statistics, University of Pennsylvania, 1979.

Dissertation was awarded Honorable Mention in the 1982 American Marketing Association Dissertation Competition.

Dissertation was named Winner of the 1983 Academy of Marketing Science Dissertation Competition.

Invited speaker at the J. Parker Bursk Memorial Prize Luncheon, Department of Statistics, University of Pennsylvania, 1992.

Invited speaker at American Marketing Association Doctoral Consortium, University of Southern California, 1999.

Cited for outstanding editorial support, Fordham University Pricing Center, Sept. 2002.

Named one of the inaugural winners of the Best Reviewer Award for the *Journal of Retailing,* 2003.


**SELECTED CONSULTING AND OTHER PROFESSIONAL ACTIVITIES**

AOL MovieFone, Inc., New York, NY.  Performed general consulting on analyzing caller data for telephone movie information service; Consulted as expert in conjunction with damage assessment in legal procedings.

Citicorp, New York, NY. Built choice model for bank services.   Gave lectures on Marketing Strategy to CitiCards executives.

Directions for Decisions, Inc., New York, NY and Jersey City, NJ. Consulted on segmentation study of sports apparel market, designed and implemented "Construction Test", a concept design decision tool.  Performed general consulting on marketing research practice on an ongoing basis.

eComplaints.com, New York, NY.  Member board of advisors.

Federal Trade Commission, Washington, D.C.  Served as consultant on branding strategies in antitrust investigation.

J.C. Penney Co., New York, NY.  Performed sales-advertising response analysis.  Work was done on request for Management Decision Systems, Inc., Weston, MA.


The Open Center, New York, NY.  Consulted on marketing strategy and direct marketing practices.

Pfizer Pharmaceuticals, New York, NY.  Conducted seminar on conjoint analysis.

Union Carbide Corporation, Danbury CT, Built econometric model to forecast prices .

Various Expert Witness Engagements in Intellectual Property Cases.   Clients include AOL Moviefone, AT&T, Avon, Brother International, Dyson, Epson, Hershey's, BM, JP Morgan Chase, Gerber Products, Johnson & Johnson, K-Swiss, Mead Johnson, Microsoft, Monster Cable, McDonald's, Playtex, PNC Financial, Roche, Seagate, Sergio Garcia, Sharp, TiVo, Under Armour, Wal-Mart, Warnaco, and various plaintiffs in consumer class actions.


## **MEMBERSHIPS**

American Marketing Association

American Statistical Association

Association for Consumer Research

The Institute for Operations Research and Management Science (INFORMS)

International Trademark Association

Society for Consumer Psychology

American Association for Public Opinion Research

**Appendix B**

**Testimony in the Last Five Years**

<u>**Depositions**</u>

ING Bank fsb (d/b/a ING DIRECT) and ING Direct Bancorp, v. The PNC Financial Services Group, Inc., PNC Bank, National Association, and PNC Bank, Delaware, Case number 08-514-GMS-LPS, United States District Court (District of Delaware)

Roche Diagnostics Operations, Inc., and Corange International Limited vs. Abbott Diabetes Care, Incorporated, Abbott Diabetes Care Sales Corporation, Bayer Healthcare, LLC, Diagnostics Devices, Inc., Lifescan Incorporated, and Nova Biodmedical Corporation, Civil Action No. 07-753-JJF, United States District Court (District of Delaware)

The Hershey Company and Hershey Chocolate & Confectionery Corporation v. Promotion in Motion, Inc., No. 07-CV-1601 (SDW) (MCA), United States District Court (District of New Jersey).

Sharp Corporation v. Dell, Inc., Case No. 2: 08-cv-05088-PGS-Es, United States District Court (District of New Jersey).

Bayer Healthcare, LLC v. Roche Diagnostics Corporation and F. Hoffman- La Roche Ltd.,  Case No. CPR G-08-378, CPR International Institute for Conflict Prevention and Resolution.

Dayna Craft (withdrawn), Deborah Larsen, Wendi Alper-Pressman, Individually and On Behalf of All Others Similarly Situated v. Philip Morris Companies, Inc., a corporation, and Philip Morris Incorporated, a corporation, Case No. 002-00407-02 , Division No. 6 (Missouri Circuit Court, Twenty-Second Judicial Circuit, City of St. Louis).

In Re Tobacco Cases II, JCCP No. 4042, Case No. 711400 (Superior Court of the State of California for the County of San Diego).

Fancaster, Inc. vs. Comcast Corporation, Comcast Interactive Media, LLC and Comcast Cable Communications Management, LLC, Civil Action No. 08 CIV 02922 (JAG) (ES) (United States District Court, District of New Jersey)

Christopher O'Shea, Gisele Rogers and Jeff Adams vs. Epson America, Inc., Epson Accessories, Inc., Seiko Epson Corporation and DOES 1-100 inclusive, Case No. CV09-8063 PSG (CWx) (United States District Court,  Central District of California)

Bayer Healthcare, LLC. Vs. Norbrook Laboratories, Ltd. And Norbrook, Inc. USA, Case No. 08-00953 (RTR) (United States District Court, Eastern District of Wisconsin)

Munchkin, Inc. v. Playtex Products, LLC. 2011 WL 2174383 (United States District Court, Central District of California)

Hewlett-Packard Company v. Oracle Corporation, Case No.: 1-11-CV-203163 (Superior Court of the State of California, Santa Clara County)

Tria Beauty, Inc. v. Radiancy, Inc., Case No.: CV-10-5030 RS (NJV) (United States District Court, Northern District of California – San Francisco Division)

TiVo Inc. v. Verizon Communications, Inc., Civil Action No. 2:09-cv-257-JRG (United States District Court, Eastern District of Texas – Marshall Division)

Visteon Technologies, LLC. v. Garmin International, Inc., Civil Action No. 2:10-cv-10578-PDB-MAR (United States District Court, Eastern District of Michigan – Southern Division)

Margaret Korrow, on behalf of herself and others similarly situated, v. Aaron' Inc., also known as Aaron's Sales & Lease Ownership, Inc. and formerly known as Aaron Rents and John Does 1-25, Civil Action No. 10-cv-06317 (JAP) (LHG) (United States District Court, District of New Jersey)

Etkin & Company, Inc. v. SBD LLC, Dr. Arthur Agatston, SBD Trademark Limited Partnership, and SBD Holdings Group Corp., Civil Action No.: 1:11-cv-21321-Lenard/O'Sullivan, United States District Court (Southern District of Florida)

Under Armour, Inc. v. Body Armor Nutrition LLC, Civil Action No. 1:12-cv-01283-JKB, United States District Court (District of Maryland – Baltimore Division)

United States of America et. al. v. American Express Co., et. al., Case No. 10-CV-04496 (NGG) (RER), United States District Court (Eastern District of New York)

People of the State of California vs. Overstock.com, Inc., Case No. RG10-546833. Superior Court of California, (County of Alameda).

Denimafia, Inc. v. New Balance Athletic Shoe, Inc., Foot Locker, Inc., The Sports Authority, Inc., and Famous Horse, Inc., d/b/a V.I.M., Civil Action No. 12-cv-04112 (AJP), United States District Court (Southern District of New York).

**Daubert Hearing**

Sharp Corporation v. Dell, Inc., Case No. 2: 08-cv-05088-PGS-Es, United States District Court (District of New Jersey).

**Trial**

Dayna Craft (withdrawn), Deborah Larsen, Wendi Alper-Pressman, Individually and On Behalf of All Others Similarly Situated v. Philip Morris Companies, Inc., a corporation, and Philip

Morris Incorporated, a corporation, Case No. 002-00407-02 , Division No. 6 (Missouri Circuit Court, Twenty-Second Judicial Circuit, City of St. Louis).

The Hershey Company and Hershey Chocolate & Confectionery Corporation v. Promotion in Motion, Inc., No. 07-CV-1601 (SDW) (MCA), United States District Court (District of New Jersey).

Sergio Garcia v. Commissioner of Internal Revenue, Docket No. 13649-10 (United States Tax Court, Miami Florida).

Munchkin, Inc. v. Playtex Products, LLC. 2011 WL 2174383 (United States District Court, Central District of California)

In Re Tobacco Cases II, JCCP No. 4042, Case No. 711400 (Superior Court of the State of California for the County of San Diego).

People of the State of California vs. Overstock.com, Inc., Case No. RG10-546833. Superior Court of California, (County of Alameda).


**Arbitration**

Bayer Healthcare, LLC v. Roche Diagnostics Corporation and F. Hoffman- La Roche Ltd.,  Case No. CPR G-08-378, CPR International Institute for Conflict Prevention and Resolution.

# Appendix C

## Documents Relied Upon

### Procedural Filings

1. Order Denying Defendant's Motion for Judgment on the Pleadings, *Moroccanoil, Inc., a California Corporation v. Marc Anthony Cosmetics, Inc., a Canadian Corporation and Does 1 through 10, Inclusive*, United States District Court, Central District of California, Western Division, CV13-02747, May 29, 2014.
2. Complaint, *Moroccanoil, Inc., a California Corporation v. Marc Anthony Cosmetics, Inc., a Canadian corporation and Does 1 through 10, Inclusive*, United States District Court, Central District of California, Western Division, CV13-02747, April 16, 2013.
3. Opinion and Order, *THOIP v. The Walt Disney Company, et al.*, United States District Court, Southern District of New York, 08 Civ. 6823 (SAS), August 13, 2010.

### Expert Reports and Depositions

4. Expert Report of Ingrid M. Martin and backup, "Report On: Purchasing Channels for Hair Care Products," July 22, 2004.
5. Expert Report of Ingrid M. Martin and backup, "Report On: Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc. Brand Confusion Study," July 22, 2004.
6. Expert Report of Ingrid M. Martin and backup, "Supplemental Report and Errata On: Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc. Brand Confusion Study," July 25, 2004.
7. Expert Report of Oliver Northrup and backup, "Moroccanoil in American English: A Corpus Study," July 22, 2014.
8. Deposition of Marc Anthony Venere, May 2, 2014.

### Bates Stamped Documents

9. MO 0163049-016307.
10. MAC 011850-011854.

### Publicly Available Documents

11. Diamond, Shari S., "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Third Edition, The National Academies Press, 2011.
12. Diamond, Shari S., "Control Foundations: Rationales and Approaches," *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, eds. Shari S. Diamond and Jerre B. Swann, American Bar Association, 2012.
13. Form 10-K, Walgreens Co., filed October 19, 2012.
14. Gelb, Gabriel M., and Betsy D. Gelb, "Internet Surveys for Trademark Litigation: Ready or Not, Here They Come," *The Trademark Reporter*, Vol. 97, No. 5, 2007.
15. Koehn, Nancy F., and Helms, Erica, "Bumble and bumble: Building a Successful Business in Beauty and Fashion," *Harvard Business School*, February 24, 2006.

16. Jacoby, Jacob, "Are Closed-Ended Questions Leading Questions?" *Trademark and Deceptive Advertising Surveys: Law, Science and Design*, eds. Shari S. Diamond and Jerre B. Swann, American Bar Association, 2012.

17. Manual for Complex Litigation, *Federal Judicial Center*, Fourth Edition, 2004.

18. McCarthy, J. T., *McCarthy on Trademarks and Unfair Competition*, Fourth Edition, Vol. 6, Thomson Reuters, 2012.

19. McIntyre, Douglas, A., "Major Retailers That Can't Get It Together Online," *NBCNews.com*, September 1, 2011, http://www.nbcnews.com/id/44316312/ns/business-retail/t/major-retailers-cant-get-it-together-online/.

20. "Moroccanoil," *United States Patent and Trademark Office*, August 5, 2008, http://tmsearch.uspto.gov/bin/showfield?f=doc&state=4806:l4llx8.2.3

21. Rueter, Thad, "2014 Promises More Returns and In-store Pickups of Online Orders," *InternetRetailer.com*, January 21, 2014, http://www.internetretailer.com/2014/01/21/2014-promises-more-free-returns-and-store-pickups.

22. Schwarz, Norbert, and Oyserman, Daphna, "Asking Questions about Behavior: Cognition, Communication, and Questionnaire Construction," *American Journal of Evaluation*, Vol. 22, No. 2, 2001.

23. Sudman, Seymour, Norman M. Bradburn, and Norbert Schwarz, *Thinking About Answers: The Application of Cognitive Processes to Survey Methodology*, Jossey-Bass Publishers, 1996.

24. Thornburg, Robert H., "Trademark Surveys: Development of Computer-Based Survey Methods," *The John Marshall Review of Intellectual Property Law*, Vol. 4, No. 91, 2004.

25. "Understanding the Multi-Channel Shopper," *Verde Group, Jay H. Baker Retailing Center, Wharton School of the University of Pennsylvania*, 2011, http://www.wharton.upenn.edu/bakerretail/files/multi-channel_shopping_exec_summary_Apr_2012.pdf, visited on August 16, 2014.

26. "United We Stand," *American Salon*, Vol. 135, Issue 7, July 2012


### *Websites*

27. "Products," Moroccanoil, http://www.moroccanoil.com/usa/h_us_en/products, visited on August 12, 2014.

28. "Salon Professionals," Moroccanoil, http://www.moroccanoil.com/usa/h_us_en/salon-professionals, visited on August 12, 2014.

29. "Spa Treatment Overview," Moroccanoil, http://www.moroccanoil.com/usa/b_us_en/spa-treatment, visited on August 12, 2014.

30. "Moroccanoil Body Page," Moroccanoil, http://www.moroccanoil.com/usa/b_us_en, visited on August 12, 2014.

31. "Hydrating Conditioner," Moroccanoil, http://www.moroccanoil.com/usa/h_us_en/hydrating-conditioner-230, visited on August 12, 2014.

32. "Salon Locator," Moroccanoil, http://www.moroccanoil.com/usa/h_us_en/salonlocator, visited on August 1, 2014.

33. "Clarifying Shampoo," Moroccanoil, http://www.moroccanoil.com/usa/h_us_en/clarifying-shampoo, visited August 14, 2014.

34. "Extra Volume Conditioner," Moroccanoil, http://www.moroccanoil.com/usa/h_us_en/extra-volume-conditioner-231, visited August 14, 2014.

35. "Luminous Hairspray Medium," Moroccanoil, http://www.moroccanoil.com/usa/h_us_en/luminous-hairspray-1011, visited on August 14, 2014.

36. "Moroccanoil Treatment," Moroccanoil, http://www.moroccanoil.com/usa/h_us_en/moroccanoil-treatment, visited on August 14, 2014.

37. "Volumizing Mousse," Moroccanoil, http://www.moroccanoil.com/usa/h_us_en/volumizing-mousse, visited August 14 2014.

38. "Moroccanoil Intense Hydrating Mask," Moroccanoil, http://www.moroccanoil.com/usa/h_us_en/intense-hydrating-mask-640, visited on August 14, 2014.

39. "Where to Buy," Marc Anthony, http://www.marcanthony.com/buy.php, visited on August 1, 2014.

40. "Marc Anthony Salon Locations," Marc Anthony, , visited on August 12, 2014.

41. "Products & Demos," Marc Anthony, http://www.marcanthony.com/products.php, visited on August 12, 2014.

42. "Products & Demos – Oil of Morocco Argan Oil," Marc Anthony, http://www.marcanthony.com/products/oil-of-morocco-argan, visited on August 12, 2014.

43. "Google Maps," Google, https://www.google.com/maps/preview, visited on August 1, 2014.

44. "Best Practices," American Association for Public Opinion Research (AAPOR), http://www.aapor.org/Best_Practices.htm, visited on July 29, 2014.

45. "Marc Anthony True Professional Oil of Morocco Argan Oil Conditioner," drugstore.com, http://www.drugstore.com/marc-anthony-true-professional-oil-of-morocco-argan-oil-conditioner/qxp396771?catid=183400, visited on August 14, 2014.

46. "Marc Anthony True Professional Oil of Morocco Argan Oil Shampoo," drugstore.com, http://www.drugstore.com/marc-anthony-true-professional-oil-of-morocco-argan-oil-shampoo/qxp396770?catid=183479, visited on August 14, 2014.

47. "Marc Anthony True Professional Oil of Morocco Argan Oil Treatment," drugstore.com, http://www.drugstore.com/marc-anthony-true-professional-oil-of-morocco-argan-oil-treatment/qxp396772?catid=183520, visited on August 14, 2014.

48. "Marc Anthony True Professional Oil of Morocco Argan Oil Hair Spray," drugstore.com, http://www.drugstore.com/marc-anthony-true-professional-oil-of-morocco-argan-oil-hair-spray/qxp469886?catid=183515, visited on August 14, 2014.

49. "Marc Anthony True Professional Oil of Morocco Argan Oil Volumizing Mousse," drugstore.com, http://www.drugstore.com/marc-anthony-true-professional-oil-of-morocco-argan-oil-volumizing-mousse/qxp452219?catid=183517, visited on August 14, 2014.

50. "Marc Anthony Oil of Morocco Conditioner," Harmon, http://www.harmondiscount.com/621732300024.html, visited on August 14, 2014.

51. "Marc Anthony Oil of Morocco Shampoo," Harmon, http://www.harmondiscount.com/621732300017.html, visited on August 14, 2014.

52. "Marc Anthony Oil of Morocco Treatment," Harmon, http://www.harmondiscount.com/621732300031.html, visited on August 14, 2014.

53. "Marc Anthony Oil of Morocco Argan Oil Hairspray," Harmon, http://www.harmondiscount.com/621732300079.html, visited on August 14, 2014.

54. "Marc Anthony Oil of Morocco Volumizing Mousse," Harmon, http://www.harmondiscount.com/621732300048.html, visited on August 14, 2014.

55. "Marc Anthony Oil of Morocco Conditioner," Rite Aid, http://shop.riteaid.com/Marc-Anthony-Oil-Morocco-Conditioner/dp/B007EP9GF4?class=quickView&field_availability=-2&field_browse=3003305011&field_keywords=marc+anthony&id=Marc+Anthony+Oil+Morocco+Conditioner&ie=UTF8&refinementHistory=brandtextbin%2Csubjectbin%2Ccolor_map%2Cprice%2Csize_name&searchKeywords=marc+anthony&searchNodeID=3003305011&searchPage=2&searchRank=salesrank&searchSize=12#.U-EKDPlSYgE, visited on August 14, 2014.

56. "Marc Anthony Oil of Morocco Shampoo," Rite Aid, http://shop.riteaid.com/Marc-Anthony-Oil-Morocco-Shampoo/dp/B007JUQFOE?class=quickView&field_availability=-2&field_browse=3003305011&field_keywords=marc+anthony&id=Marc+Anthony+Oil+Morocco+Shampoo&ie=UTF8&refinementHistory=brandtextbin%2Csubjectbin%2Ccolor_map%2Cprice%2Csize_name&searchKeywords=marc+anthony&searchNodeID=3003305011&searchPage=1&searchRank=salesrank&searchSize=12#.U-EJb_lSYgE, visited on August 14, 2014.

57. "Marc Anthony Argan Oil Treatment, Oil of Morocco, For All Hair Types," Rite Aid, http://shop.riteaid.com/Marc-Anthony-Argan-Treatment-Morocco/dp/B007EP9APA?class=quickView&field_availability=-2&field_browse=3003305011&field_keywords=marc+anthony&id=Marc+Anthony+Argan+Treatment+Morocco&ie=UTF8&refinementHistory=brandtextbin%2Csubjectbin%2Ccolor_map%2Cprice%2Csize_name&searchKeywords=marc+anthony&searchNodeID=3003305011&searchPage=1&searchRank=salesrank&searchSize=12#.U-EJxPlSYgE, visited on August 14, 2014.

58. "Marc Anthony Oil of Morocco Argan Oil Conditioner," Ulta, http://www.ulta.com/ulta/browse/productDetail.jsp?productId=xlsImpprod4180927, visited on August 14, 2014.

59. "Marc Anthony Oil of Morocco Argan Oil Shampoo," Ulta, http://www.ulta.com/ulta/browse/productDetail.jsp;jsessionid=nBb4yS6V2Ze2QKaD77fXFQ5B.pra1-app1?productId=xlsImpprod4180921, visited on August 14, 2014.

60. "Marc Anthony Oil of Morocco Argan Oil Volume Shine Hairspray," Ulta, http://www.ulta.com/ulta/browse/productDetail.jsp;jsessionid=nBb4yS6V2Ze2QKaD77fXFQ5B.pra1-app1?productId=xlsImpprod5250301, visited on August 14, 2014.

61. "Marc Anthony Oil of Morocco Argan Oil Volumizing Mousse," Ulta, http://www.ulta.com/ulta/browse/productDetail.jsp?productId=xlsImpprod5250295, visited on August 14, 2014.

62. "Marc Anthony True Professional Oil of Morocco Argan Oil Shampoo," Walgreens, http://www.walgreens.com/store/c/marc-anthony-true-professional-oil-of-morocco-argan-oil-shampoo/ID=prod6124611-product, visited on August 14, 2014.

63. "Marc Anthony True Professional Oil of Morocco Argan Oil Treatment," Walgreens, http://www.walgreens.com/store/c/marc-anthony-true-professional-oil-of-morocco-argan-oil-treatment/ID=prod6144193-product, visited on August 14, 2014.

64. "Marc Anthony True Professional Oil of Morocco Argan Oil Hair Spray," Walgreens, http://www.walgreens.com/store/c/marc-anthony-true-professional-oil-of-morocco-argan-oil-hair-spray/ID=prod6124613-product, visited on August 14, 2014.

65. "Marc Anthony True Professional Oil of Morocco Argan Oil Volumizing Mousse," Walgreens, http://www.walgreens.com/store/c/marc-anthony-true-professional-oil-of-morocco-argan-oil-volumizing-mousse/ID=prod6171540-product, visited on August 14, 2014.

66. "Marc Anthony Oil of Morocco Argan Oil Treatment," CVS Pharmacy,
http://www.cvs.com/shop/product-detail/Marc-Anthony-Oil-of-Morocco-Argan-Oil-
Treatment?skuId=954253, visited on August 14, 2014.

67. "Marc Anthony Oil of Morocco Argan Oil Sulfate Free Volume + Shine Hairspray," CVS Pharmacy,
http://www.cvs.com/shop/product-detail/Marc-Anthony-Oil-of-Morocco-Argan-Oil-Sulfate-Free-
Volume--Shine-Hairspray?skuId=954252, visited on August 14, 2014.

## Appendix D

### Procedures for Sampling Salons and Mass-Market Retailers

This appendix describes how I selected my convenience sample of salons/spas and mass-market retailers geographically adjacent to Analysis Group offices located in nine U.S. cities. It also describes the protocols that I provided to Analysis Group employees who collected data on Moroccanoil and Marc Anthony products under my supervision.

### I. Salon/Spa and Mass-market Retailer Sample Identification

First, I identified the addresses of the nine Analysis Group offices throughout the United States:

1. 111 Huntington Avenue, **Boston MA** 02199
2. 10 Rockefeller Plaza, **New York City, NY** 10020
3. 800 17th Street, NW, **Washington D.C.** 20006
4. Two Prudential Plaza 180 North Stetson Avenue, **Chicago, IL** 60601
5. 2911 Turtle Creek Boulevard, **Dallas, TX** 75219
6. 1900 16th Street, **Denver, CO** 80202
7. 333 South Hope Street, **Los Angeles, CA** 90071
8. 650 California Street, **San Francisco, CA** 94108
9. 1010 El Camino Real, **Menlo Park, CA** 94025

For each city, I then identified the nearest spa or salon that sells Moroccanoil products using the Moroccanoil salon/spa locater on its website.[1] In the "Zip Code" field of the search engine, I entered the zip code of the Analysis Group office location for each city listed above. I also activated the "Hair" product option under the "Search for Products" heading to ensure that the search results included locations that sell hair care products. My search resulted in the following salons/spas.

1. Boston – **Mizu**[2] – 776 Bolyston Street
2. New York City – **AKS Salon** – 689 5th Avenue
3. Washington D.C. – **Fusion Day Spa** – 1705 L Street NW
4. Chicago – **Anna George X** – 233 N Michigan Avenue
5. Dallas – **Denovo** – 2603 Oak Lawn Avenue, Suite 100
6. Denver – **Colorado Cut and Color**[3] – 1000 15th Street

---

[1] "Salon Locater," Moroccanoil, http://www.moroccanoil.com/usa/h_us_en/salonlocator, visited on August 1, 2014.

[2] In my initial search for Boston, MA using the Moroccanoil salon locater, I identified "Safar" at 235 Newbury Street, Boston MA 02199, as the nearest salon/spa in area code 02199. However, a store representative at Safar indicated that another salon, Mizu, distributes Moroccanoil and is closer to the Analysis Group Boston office. Therefore, I included Mizu in my sample.

[3] In my initial search for Denver, CO using the Moroccanoil salon locater, I identified "Colorado Cut'n Company" at 1020 15th Street, as the nearest salon/spa in the area code 80202. However, a store representative

7. Los Angeles – **Ritz-Carlton Spa** – 900 W Olympic Boulevard
8. San Francisco – **Bibbo Salon** – 336 Sutter Street
9. Menlo Park – **Sasha Salon** – 58 El Camino Real

For each city, I then identified the mass-market retailer that sells Marc Anthony Oil of Morocco Argan Oil products that is nearest to the Analysis Group office. According to the Marc Anthony website, Marc Anthony products are available in the United States at the following retailers:[4]

1. CVS/Pharmacy
2. Duane Reade
3. Harmon Stores
4. HEB
5. Rite Aid
6. Ulta
7. Walgreens

For each city, I searched for the above retailers using Google Maps to identify the one closest to the Analysis Group office.[5] In New York, Washington D.C., Los Angeles, San Francisco and Menlo Park, the closest retailer to the Analysis Group office that I identified did not carry Marc Anthony Oil of Morocco Argan Oil products. In those cases, I identified the next closest retailer that did carry the relevant products. My search resulted in the following retailers in each city:

1. Boston – **Walgreens** – 841 Bolyston Street
2. New York City – **Rite Aid** – 301 W 50th
3. Washington D.C. – **Walgreens** – 1217 22nd Street NW
4. Chicago – **CVS/Pharmacy** – 205 N Michigan Avenue
5. Dallas – **Walgreens** – 3802 Cedar Springs Road
6. Denver – **Walgreens** – 801 16th Street Mall
7. Los Angeles – **Rite Aid** – 500 S Broadway
8. San Francisco – **Walgreens** – 141 Kearny Street
**9.** Menlo Park – **Walgreens** – 300 University Avenue

## II.    Data Collection Procedures

I instructed Analysis Group employees to collect photographs and price data on Moroccanoil and Marc Anthony Oil of Morocco Argan Oil products. I provided the following procedures for them to follow:

- Take digital photographs at each salon/spa/retailer in the sample of the following:

  - Front entrance
  - Front window
  - Product aisle

---

indicated that the store that sells Moroccanoil products is named Colorado Cut and Color, and is located nearby at 1000 15th Street.

[4] "Where to Buy," Marc Anthony, http://www.marcanthony.com/buy.php, visited on August 1, 2014.

[5] "Google Maps," Google, https://www.google.com/maps/preview, visited on August 1, 2014.

- - o   Product displays and positioning relative to competing brands

- Collect price data on the following products **if available** (Also indicate if the products **are not available**):

  - o   Oil of Morocco Argan Oil Sulfate Free Shampoo (250 ml)
  - o   Oil of Morocco Argan Oil Sulfate Free Conditioner (250 ml)
  - o   Oil of Morocco Argan Oil Treatment (50 ml)
  - o   Oil of Morocco Argan Oil Sulfate Free Volumizing Mousse (250 ml)
  - o   Oil of Morocco Argan Oil Sulfate Free Volumizing Hairspray (300 ml)
  - o   Moroccanoil Clarifying Shampoo (250 ml)
  - o   Moroccanoil Intense Hydrating Mask (75 ml)
  - o   Moroccanoil Treatment (100 ml)
  - o   Moroccanoil Volumizing Mousse (250 ml)
  - o   Moroccanoil Luminous Hairspray (330 ml)
  - o   Moroccanoil Extra Volume Conditioner (250 ml)

- Note whether or not an employee who is knowledgeable of the available products approached you.

- Note the range of brands that are available: whether there are less than 10, between 10 and 25, or more than 25 brands.

**Appendix E – Select Convenience Sample Images**

**Mass-Market Retailers (Section 1: Figures 1 – 27)**

**Salons (Section 2: Figures 28 – 59)**

## **Section I: Mass-market Retailers by City**



**Figure 1: Boston**

E-3



**Figure 2: Boston**



**Figure 3: Boston**



**Figure 4: Chicago**



**Figure 5: Chicago**



**Figure 6: Chicago**



**Figure 7: Dallas**



**Figure 8: Dallas**



**Figure 9: Dallas**



**Figure 10: Denver**



**Figure 11: Denver**



**Figure 12: Denver**



**Figure 13: Los Angeles**



**Figure 14: Los Angeles**



**Figure 15: Los Angeles**



**Figure 16: Menlo Park**

(Note: this retailer is located in Palo Alto.  It is the closest retailer that sells Marc Anthony products.)



**Figure 17: Menlo Park**



**Figure 18: Menlo Park**



**Figure 19: New York**



**Figure 20: New York**



**Figure 21: New York**

**Figure 22: San Francisco**



**Figure 23: San Francisco**



**Figure 24: San Francisco**



**Figure 25: Washington D.C.**

**Figure 26: Washington D.C.**



**Figure 27: Washington D.C.**